**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| _____ ) | | |
| **DAWN THOMPSON, on behalf of** ) | | |
| **herself and all others similarly situated,** ) | | |
| ) | **Civil Action No. 05-11169-DPW** | |
| **Plaintiff,** ) | | |
| ) | | |
| **v.** ) | | |
| ) | | |
| **WYETH, INC., et al.** ) | | |
| ) | | |
| **Defendants.** ) | | |
| _____ ) | | |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**INTRODUCTION**

Plaintiff filed this putative class action lawsuit against various manufacturers of

nonprescription pediatric cough suppressants containing the active ingredient dextromethorphan.

Plaintiff seeks economic damages to recover amounts expended on these products on the

grounds that the products are ineffective and that Defendants, by representing the products as

effective, have defrauded Plaintiff and others similarly situated.

By this motion, Defendants ask this Court to dismiss Plaintiff's one-count

common law fraud complaint as preempted by federal law.  The United States Food and Drug

Administration ("FDA") has specifically found – by regulation – that the products challenged by

Plaintiff are safe and effective for pediatric use, and has established detailed requirements for

their labeling and marketing.  Plaintiff's attempt to overturn and supplant FDA's requirements

through this state law action is expressly prohibited by federal statute.

Congress in 1997 enacted a straightforward statutory preemption provision governing nonprescription, or over-the-counter ("OTC"), drugs such as the cough suppressants here. The preemption provision, codified as section 751 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 379r), bars Plaintiff's claim. Courts in California, *Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780 (Cal. Ct. App. 2002), and Texas, *Warner-Lambert Co. v. Mills*, 117 S.W.3d 488 (Tex. App. 2003), *rev'd on other grounds*, 157 S.W.3d 424 (Tex. 2005), have already addressed this precise issue and held unequivocally that claims mirroring Plaintiff's claims are preempted. The decisions in *Kanter* and *Mills*, which are on all fours with this case, are attached for the Court's reference as Exhibits A and B. Moreover, even without express statutory preemption, Plaintiff's claim is in direct conflict with governing FDA requirements and is therefore barred under the doctrine of implied preemption.

Accordingly, Plaintiff's action fails as a matter of law and should be dismissed with prejudice under Federal Rule of Civil Procedure 12(b)(6).[1]

## BACKGROUND

### I.    Regulatory Framework

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and FDA's implementing regulations, provide a comprehensive scheme of drug regulation designed to ensure the safety and effectiveness of the nation's drug supply. Under this scheme, subject to certain limited exceptions that are not applicable here, no OTC drug product may be introduced into interstate commerce unless the product is the subject of an FDA-approved New

---

[1] Novartis Corporation answered the Complaint on July 7, 2005, and therefore makes its motion under Rule 12(c). "The standard for evaluating a motion for judgment on the pleadings is essentially the same as the standard for evaluating a Rule 12(b)(6) motion." *Petricca v. City of Gardner*, 194 F. Supp. 2d 1, 4 (D. Mass. 2002) (internal quotations omitted).

Drug Application ("NDA") or the product meets the conditions of a special FDA regulation known as an OTC "monograph." *See* 21 U.S.C. § 355(a); 21 C.F.R. § 330.1.  The OTC cough suppressants that are the subject of Plaintiff's lawsuit are marketed pursuant to a final monograph codified at 21 C.F.R. pt. 341.

###    A.    The OTC Monograph System

OTC monographs set out the conditions under which a category of nonprescription drugs may be marketed without an individual NDA.  *See Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 650 (1973); 21 C.F.R. § 330.1.  In order to issue a monograph for a category of products, FDA must determine through rulemaking that the products are "generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling . . . ."  21 U.S.C. § 321(p)(1); 21 C.F.R. § 330.1.

The OTC monograph process is extremely rigorous.  The FDA Commissioner appoints an advisory review panel of independent experts, which "review[s] all available data" and reports its "conclusions and recommendations" to FDA "with respect to the safety and effectiveness of the drugs" in the designated OTC category.  21 C.F.R. § 330.10(a); *Bentex*, 412 U.S. at 650-51.  FDA then publishes in the Federal Register its findings on which drugs are safe and effective and on how such drugs shall be labeled for patient use.[2]  21 C.F.R. § 330.10(a)(6), (7); *Bentex*, 412 U.S. at 650-51.  An opportunity for public comment follows.

---

[2] FDA may find substantial evidence of effectiveness even in the face of credible evidence to the contrary.  *See* S. Rep. No. 87-1744, at 2892 (July 19, 1962) ("When a drug has been adequately tested by qualified experts and has been found to have the effect claimed for it, this claim should be permitted even though there may be preponderant evidence to the contrary based upon equally reliable studies.").

21 C.F.R. §§ 330.10(a)(6)(iv), (a)(7)(i), (a)(8).  FDA then publishes in the form of a regulation

the final monograph "establishing conditions under which a category of OTC drugs . . . [is]

generally recognized as safe and effective and not misbranded."  *Id.* § 330.10(a)(9).

### B.    Marketing A Drug Under An FDA Monograph

An OTC drug sold pursuant to a monograph must meet FDA's requirements

regarding permissible active ingredients, dosage strength, dosing instructions by patient age, and

other mandatory labeling.  *See* 21 C.F.R. § 330.1 and pts. 331-358.  For example, the "Uses"

section of the product label "shall contain the labeling describing the 'Indications' that have been

established in an applicable OTC drug monograph or alternative truthful and nonmisleading

statements describing only those indications for use that have been established in an applicable

monograph . . . ."  *Id.* § 330.1(c)(2).  All advertising for the product must recommend or suggest

use of the product only under the conditions stated in the labeling.  *Id.* § 330.1(d).

Any product that fails to contain the required labeling statements on uses and

dosing instructions for different patients, or otherwise fails to conform to each applicable

monograph condition, violates federal law.  *Id.* § 330.1; 21 U.S.C. §§ 352 & 355; *see also*

*Bentex*, 412 U.S. at 650.  Thus, where the FDA monograph states that a product is effective for a

particular use, such as the relief of cough, that indication statement must appear on the product

label with the corresponding dosing information specified for different age groups.  Violation of

these requirements subjects the manufacturer to FDA enforcement action for introducing an

unapproved or misbranded drug into interstate commerce, which may result in seizure, injunctive

relief, criminal fines, and imprisonment.  21 U.S.C. §§ 331-334.

### C.    Amendment of Final Monographs

FDA regulations provide an express mechanism for the consideration of new

information related to the safety or effectiveness of OTC products.  Specifically, FDA

regulations provide that any final monograph may be amended or repealed.  *See* 21 C.F.R.

§ 330.10(a)(12).  The FDA may propose such an amendment or repeal on its own initiative or

may consider amendment or repeal in response to a petition by any interested person.  *Id.*

**II.    Requirements Governing Cough Suppressants Containing Dextromethorphan**

On September 9, 1976, based upon recommendations of the Advisory Review

Panel on Over-the-Counter Cold, Cough, Allergy, Bronchodilator and Antiasthmatic Products,

FDA published a proposed monograph for cold, cough, allergy, bronchodilator and antiasthmatic

drugs.  41 Fed. Reg. 38312 (Sept. 9, 1976).  With respect to antitussive products (cough

suppressants), the proposed monograph listed dextromethorphan as an active ingredient that,

when properly labeled and administered in the specified doses, is "generally recognized as safe

and effective."  *Id.* at 38419.

The preamble accompanying the proposed monograph indicates that the Panel

considered a wide variety of studies in evaluating the effectiveness of dextromethorphan and

concluded that dextromethorphan is an effective antitussive:

> Dextromethorphan is an active antitussive comparable to codeine on a mg-
> for-mg basis for cough suppression.  Studies involving many species of
> animals and many methods for inducing cough have demonstrated that
> effectiveness of dextromethorphan as an antitussive is comparable to
> codeine. . . .
>
> There have been a large number of studies in man over the past 20 years.
> These have consisted of:  Experimentally induced cough with controlled
> double-blind crossover designs in which all but one showed effective
> antitussive activity; controlled subjective studies in pathologic cough;
> controlled objective studies in pathologic cough; and uncontrolled
> subjective studies in a variety of disease states resulting in cough. . . .
>
> The majority of these clinical studies demonstrate effective antitussive
> activity.  Even though a few of the studies questioned the effectiveness of
> dextromethorphan, the Panel concluded that based on the evidence
> presented, *dextromethorphan is generally recognized as effective*[.]

*Id.* at 38340 (emphasis added) (citations omitted).

After considering comments to the proposed monograph, FDA issued a tentative final monograph in 1983 and then a final monograph for antitussive drugs in 1987. 48 Fed. Reg. 48576 (Oct. 19, 1983); 52 Fed. Reg. 30042 (Aug. 12, 1987). In issuing the final monograph, FDA declared that the monograph "establish[es] conditions under which over-the-counter (OTC) antitussive drug products (drug products used to relieve cough) are generally recognized as safe and effective and not misbranded." 52 Fed. Reg. at 30042; *see also* 21 C.F.R. § 341.1.

Antitussives meeting monograph conditions must include one of the listed active ingredients. 21 C.F.R. § 341.14. Dextromethorphan is listed in the final monograph as one of the approved active ingredients for antitussives. *Id.* § 341.14(a)(3), (4). The conditions also include requirements relating to the product labeling. Of particular relevance here, the monograph requires all dextromethorphan product labeling to include an "Indications" section stating that the product "temporarily [alleviates, calms, controls, decreases, quiets, reduces, relieves, or suppresses] cough . . . ." *Id.* §§ 330.1(c)(2); 341.74(b)(1), (2).

The labeling FDA has adopted for cough suppressants containing dextromethorphan specifically extends to children. The monograph sets forth a safe and effective dosing range for children, divided for dosing purposes into 12 years of age or over, under 12 years of age to 6, and 6 years of age to 2. *Id.* § 341.74(d)(1)(iii).[3] For example, the FDA-labeling specifies that 7.5 milligrams of dextromethorphan is a safe and effective dose to be administered every 6 to 8 hours to children 2 to under 6 years of age. *See id.*

---

[3] For children under two, FDA provides directions to consult a doctor. 21 C.F.R. § 341.74(d)(1)(iii).

In sum, FDA has established through rulemaking that dextromethorphan is a cough suppressant "generally recognized as safe and effective" for both adults and children over the age of 2 when all monograph requirements are satisfied, and has imposed specific and detailed requirements to govern the marketing of dextromethorphan products.

## III.    Plaintiff's Allegations

The central allegation in Plaintiff's Complaint is that, contrary to the FDA monograph, cough suppressants containing dextromethorphan are "no more effective in children than a placebo." (Compl. ¶ 2.) Plaintiffs base this allegation on certain purported "studies and articles" published in 2004, well after the promulgation of FDA's monograph.[4] (*Id.* ¶¶ 19-20.) Plaintiff claims that Defendants, by stating in their labels and elsewhere that the products "are effective in suppressing coughs in children," defrauded Massachusetts consumers. (*Id.* ¶¶ 17, 30-34.) Plaintiff claims that she and others who purchased the products were "damaged by purchasing useless products," and she seeks economic damages in the amount expended on these products. (*Id.* ¶ 34, Prayer for Relief.)

Plaintiff's action thus rests exclusively on the contention that cough suppressants containing dextromethorphan are ineffective for children, a contention that is squarely contrary to the prevailing FDA findings and governing OTC monograph.

---

[4] Plaintiff alleges that "the Merck Manual of Diagnosis and Therapy, a reference book used by physicians and written by an editorial board of medical experts, says there is little evidence that cough syrups provide any benefit at all." (Compl. ¶ 21.) Plaintiff misrepresents this text. The Merck Manual states that there is no clear evidence of the effectiveness of *expectorants*. Merck Manual of Diagnosis and Therapy, § 6, ch. 63, at 513 (Attached as Ex. C). Dextromethorphan, however, is an antitussive, not an expectorant. With respect to antitussives, the Merck Manual states, "For simple suppression of a nonproductive cough, dextromethorphan is preferred . . . ." *Id.* at 514.

## STANDARD OF REVIEW

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate when the complaint presents no set of facts justifying recovery. *Cooperman v. Individual Inc.*, 171 F.3d 43, 46 (1st Cir. 1999); Fed. R. Civ. P. 12(b)(6). Dismissal as a matter of law under Rule 12(b)(6) is appropriate when the plaintiff's state law claims are preempted by federal law. *See Degnan v. Publicker Indus., Inc.*, 83 F.3d 27, 29 (1st Cir. 1996).

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States…shall be the Supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under this provision, state laws that "interfere with, or are contrary to the laws of Congress" are preempted. *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 822 (1st Cir. 1992), (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)); *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) ("[S]tate law that conflicts with federal law is without effect.") (internal quotations omitted).

## ARGUMENT

## I.    Plaintiff's Cause Of Action Is Expressly Preempted By the Federal Food, Drug, and Cosmetic Act.

Express preemption occurs "when a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion." *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000). When a statute contains an express preemption provision, the court's "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002) (internal quotations omitted).

The FDCA includes an express preemption provision with respect to the regulation of OTC drug products, codified as 21 U.S.C. § 379r.  Section 379r, entitled "National uniformity for nonprescription drugs," provides in relevant part:

> [N]o State or political subdivision of a State may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription drug]; and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under [the Federal Food, Drug, and Cosmetic Act] . . . .

21 U.S.C. § 379r(a).  Section 379r is a sweeping preemption provision.  By its terms, section 379r preempts any state requirement that relates to a federally regulated nonprescription drug, unless it is "identical with" a federal requirement.  This provision expresses Congress' manifest intent to ensure a uniform federal standard for the regulation of nonprescription drug products.

Plaintiff's claim flies in the teeth of section 379r.  As described above, FDA has specifically determined that cough suppressants containing dextromethorphan are effective when used as directed, and has established detailed requirements in a federal regulation that governs the labeling and marketing of such products.  Plaintiff ignores these federal pronouncements and seeks through state law to hold Defendants liable for labeling and marketing their products as effective, when that is what federal law requires.  In so doing, she would disrupt the scheme of "national uniformity" that section 379r was designed to ensure by imposing different requirements for the sale of OTC cough suppressants in Massachusetts than those which apply in every other State.  This she cannot do.

This is a classic case of express preemption.  Plaintiff's state law fraud claim cannot be maintained under the plain text of section 379r.  In the directly analogous cases of *Kanter* and *Mills* (Exs. A & B), courts in California and Texas have so ruled.  The same determination follows here.

A.    **Plaintiff's Action Is Directly At Odds With Federal Requirements.**

In order to market a dextromethorphan product in accordance with federal law, Defendants must present the product as an effective cough suppressant with labeling for use in children. Plaintiff would overturn FDA's base scientific finding concerning the effectiveness of dextromethorphan, and revise the labeling FDA has set forth in regulation. Simply stated, Plaintiff seeks to undo federal law and arrogate to the plaintiffs' bar the regulation of this drug.

Plaintiff's cause of action, if successful, would prohibit manufacturers of pediatric cough suppressants containing dextromethorphan from stating that these products are effective for the treatment of cough in children. As detailed above, however, FDA specifically requires the labeling of all products sold under a monograph to contain an "Indications" section. 21 C.F.R. § 330.1(c)(2). For dextromethorphan products, the "Indications" section *must* state that the product temporarily "alleviates," "calms," "controls," "decreases," "quiets," "reduces," "relieves," or "suppresses" coughs. *Id.* § 341.74(b). In addition, FDA's monograph requires all dextromethorphan products to contain detailed information on dosing for different age groups, including children. *Id.* § 341.74(d)(1)(iii). Plaintiff's action would adjudge such required labeling of effectiveness for children "fraudulent" on the grounds that the product is ineffective and should not be used in those patients.

The prohibitions that Plaintiff seeks to impose through state law are inescapably "different from" and "not identical with" FDA's regulations on dextromethorphan products. Indeed, the state requirement would create a direct and irreconcilable conflict with federal law by *prohibiting* under state law that which is *required* under federal law. The manufacturer would be forced to omit mandatory FDA labeling statements on the effective uses of dextromethorphan and the appropriate dosing for children, and would thus be introducing a misbranded product into

interstate commerce in violation of the FDCA and at the risk of a federal seizure, injunction, prosecution, or other FDA enforcement action.

A state prohibition on the representation of pediatric cough suppressants containing dextromethorphan as effective for the treatment of cough would also undo the express permission provided by federal law for manufacturers to advertise OTC products for the uses determined to be effective in a monograph. As described above, the monograph permits any statement in the product advertising that "prescribes, recommends, or suggests its use . . . under the conditions stated in the labeling." *Id.* §§ 330.1(d). For dextromethorphan products, this permits a statement in the product advertising that the product temporarily alleviates cough, or equivalent language. *See id.* §§ 330.1(c)(2); 341.74(b). A state prohibition on such a statement in the product advertising would constitute a requirement relating to dextromethorphan that is "in addition to" and "not identical with" the federal regulations governing dextromethorphan.

The express terms of section 379r bar this attempt to alter federal law. If Plaintiff believes that dextromethorphan products are ineffective, she is entitled to petition FDA requesting amendment or repeal of the monograph, *see supra* Background § I.C.; what she may not do is to seek to overturn that determination through a purported state law fraud claim.

**B.     Section 379r Applies To State Common Law Causes Of Action.**

Congress did not limit preemption under section 379r to specific enactments of state legislatures or regulatory bodies. Instead, section 379r applies broadly to "any requirement" under state law, whether that requirement arises under state common law, statutory

law, or regulatory law, and whether the state requirement is drug-specific or applies more broadly.  21 U.S.C. § 379r(a).[5]

The United States Supreme Court has made clear that state "requirements" for purposes of federal preemption provisions encompass suits for damages brought by private plaintiffs under state law, and are not limited to legislative enactments or regulatory provisions directed at a particular product or class of products.  Just this year in *Bates v. Dow Agrosciences LLC*, the Supreme Court held that "the term 'requirements' in [the express preemption provision of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA")] reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties."  125 S. Ct. 1788, 1798 (2005).[6]

The Supreme Court's holding in *Bates* follows its ruling in *Cipollone v. Liggett Group, Inc.* construing the express preemption provision of the Federal Cigarette Labeling and Advertising Act.  505 U.S. 504, 521 (1992) (Stevens, J, joined by Rehnquist, C.J., and White and O'Connor, JJ.); *id.* at 548-49 (Scalia, J., joined by Thomas, J., concurring in the judgment in part and dissenting in part).  As Justice Stevens explained in *Cipollone*, "state regulation can be as

---

[5] *See also* S. Rep. No. 105-43, at 66 (July 1, 1997) ("All forms of State requirements that affect these products are included within the general rule of national uniformity, whether they are specifically denominated as applying to nonprescription drugs and cosmetics or more broadly apply to unfair competition . . . .").

[6] The FIFRA preemption provision at issue in *Bates* provided:  "Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."  7 U.S.C. § 136v(b).  The FIFRA language is narrower than the preemption provision here in that it is limited to requirements "for labeling or packaging."  This limitation did not affect the Court's determination that plaintiffs' state law fraud claim – the only claim at issue in this case – constituted a requirement subject to preemption under FIFRA.  125 S. Ct. at 1799-1800.  However, the Court did find that certain other common law claims asserted in *Bates* (for design defect, manufacturing defect, breach of warranty, and negligent testing), even though they qualified as state law "requirements," did not satisfy the further condition in FIFRA that the requirements relate to "labeling or packaging."  *Id.* at 1798-99.

effectively exerted through an award of damages as through some form of preventive relief." *Id.*
at 521 (internal quotations and alterations omitted).  "The obligation to pay compensation can be,
indeed is designed to be, a potent method of governing conduct and controlling policy." *Id.*[7]

Consistent with this Supreme Court precedent, the Supreme Judicial Court of
Massachusetts ("SJC") held that FIFRA's express preemption provision "preclude[s] States not
only from mandating…requirements by means of statute or regulation, but also…preclude[s]
States from achieving a similar result through the establishment and application of pertinent tort
law." *Hochberg v. Zoecon Corp.*, 657 N.E.2d 1263, 1266 (Mass. 1995).  The SJC emphasized
that  "*all* State action" pertaining to labeling requirements was preempted under the express
preemption provision.  *Id.* at 1266 (emphasis added).

Under the plain language of section 379r and under well-established preemption
doctrine, this cause of action arising under the common law of Massachusetts would be no less a
"requirement . . . that relates to the regulation" of dextromethorphan than would a positive
enactment by the Massachusetts legislature or Massachusetts regulatory body relating to these
products.  Plaintiff's cause of action is therefore subject to the full preemptive force of section
379r.

---

[7] The Supreme Court has reached the same conclusion in interpreting an express preemption
clause in another section of the FDCA governing the regulation of medical devices that is similar
to the clause here.  *See*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 509 (1996) ("[S]tate common-law
damages actions do impose 'requirements' and are therefore pre-empted where such
requirements would differ from those imposed by the FDCA.") (O'Connor, J., joined by
Rehnquist, C.J., and Scalia and Thomas, JJ., concurring in part and dissenting in part); *id.* at 504
("[T]he MDA . . would also pre-empt a . . . requirement that takes the form of a standard of care
or behavior imposed by a state-law tort action.") (Breyer, J., concurring in part and concurring in
the judgment).  The FDCA's express preemption provision for medical devices at issue in
*Medtronic* provides:  "[N]o State or political subdivision of a State may establish or continue in
effect with respect to a device intended for human use any requirement—(1) which is different
from, or in addition to, any requirement applicable under this chapter to the device, and (2)
which relates to the safety or effectiveness of the device . . . ."  21 U.S.C. § 360k(a).

**C.    Two Other Courts Have Considered This Issue And Held That § 379r Expressly Preempts Similar Claims.**

Two courts have already held that section 379r preempts state law claims based on the assertion that an OTC drug product subject to a final monograph is ineffective, and no court has held to the contrary. First, in *Kanter v. Warner-Lambert Co.*, the plaintiffs claimed that OTC pediculicides, or agents indicated for the treatment of head lice, were ineffective and that the defendants' representations to the contrary were false and misleading. 99 Cal. App. 4th 780, 784 (Cal. Ct. App. 2002). Analogous to the instant case, the products alleged to be ineffective in *Kanter* were subject to an OTC drug monograph declaring the effectiveness of these products for the treatment of head lice and requiring the product labeling to state that the products are indicated for the treatment of head lice. *Id.* at 787-88.

The *Kanter* court held that the plaintiffs' claims were preempted under section 379r. *Id.* at 797. Specifically, it held that the OTC drug monograph system establishes a federal requirement regarding labeling that would, under section 379r, preempt any different state law requirements. *Id.* at 794. It further held that each of the plaintiffs' claims would establish a different state law requirement because each was based on the assertion that the FDA-mandated labeling was not accurate or adequate:

> [E]ach [of the plaintiffs' legal theories] is bottomed on the assertion that this approved label is no longer accurate or adequate and that the label should be changed or the product banned. Each cause of action would result in the establishment of a state requirement regarding labeling that would be "different from" and "otherwise not identical with" the federally required label, and each is therefore preempted.

*Id.* at 796 (citations omitted). Accordingly, the court held that all of the plaintiffs' state law claims were preempted under section 379r. *Id.* at 797.

Second, in *Warner-Lambert Co. v. Mills*, the plaintiffs again claimed that OTC products indicated for the treatment of head lice were ineffective and that the defendants'

representations to the contrary were false.  *See* 117 S.W.3d 488, 491 (Tex. App. 2003), *rev'd on other grounds*, 157 S.W.3d 424 (Tex. 2005).[8]  In holding that the plaintiffs' claims were preempted, the court reasoned that "the state lawsuit would make unlawful the sale of a product formulated to comply with a federal requirement."  *Id.* at 494.  Accordingly, the court held that the claims would impose a state requirement that was "different from or in addition to, or that is otherwise not identical with, a requirement under the Act" and was preempted under § 379r.  *Id.* (internal quotations omitted).

This case is *Kanter* and *Mills*, except that it involves cough suppressants instead of head lice products.  *Kanter*, *Mills*, and the instant case all involve OTC products subject to an FDA OTC drug monograph establishing the effectiveness of the product for a particular use and specifying the labeling and other requirements for the product.  The plaintiffs in *Kanter*, *Mills*, and the instant case all claim that the products – contrary to FDA's determination – are ineffective for that particular use.  More specifically, the plaintiffs in *Kanter*, *Mills*, and the instant case all claim that the products – contrary to FDA requirements – should not be labeled and/or advertised as effective for that particular use.  As in *Kanter* and *Mills*, the state law claim in the instant case is expressly preempted under section 379r.

**D.**     **No Exception Applies to Remove this Case From the Scope of Section 379r.**

Section 379r contains carefully crafted exceptions for defined state law requirements.  None of these limited exceptions applies here.

---

[8] The *Mills* court held that because the plaintiffs' claims were preempted under section 379r, the trial court lacked "subject matter jurisdiction."  117 S.W.3d at 494.  Without reaching the merits of the preemption issue, the Supreme Court of Texas reversed the intermediate appellate court on the jurisdictional question, recognizing that while the defendant would have an affirmative defense to state law claims preempted by section 379r, the statute did not go so far as to deprive state courts of jurisdiction and require that all such claims be heard only in a federal forum. 157 S.W.3d at 428.

Only one of the exceptions in section 379r applies to private causes of action. This exception provides that "[n]othing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State." 21 U.S.C. § 379r(e). The exception for product liability law, far from saving Plaintiff's claim from preemption under section 379r, provides additional confirmation of Congress' intent to preempt all state law causes of action except product liability claims. As the court held in *Mills*, "[t]hat Congress included specific exemption language within § 379r suggests Congress' intent to preempt all other statutory or common-law state causes of action." 117 S.W.3d at 494. *Cf. United States v. Brockamp*, 519 U.S. 347, 352 (1997) ("[E]xplicit listing of exceptions, taken together, indicate to us that Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute that it wrote.").

Plaintiff's cause of action is not a product liability action under black letter law in Massachusetts. As in most states, the law of "product liability" in Massachusetts does not encompass lawsuits seeking purely economic losses in the absence of personal injury or property damage. *See, e.g., FMR Corp. v. Boston Edison Co.*, 613 N.E.2d 902, 903 (Mass. 1993) ("[P]urely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage."); *Bay State-Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co.*, 533 N.E.2d 1350, 1353 (Mass. 1989) ("[I]n this State when economic loss is the only damage claimed, recovery is not allowed in tort-based strict liability or in negligence." (citations omitted)).

The basic principle in Massachusetts that product liability actions are only those involving personal injury or property damages is consistent with well-established law throughout the country. For example, the Restatement (Third) of Torts provides that the only economic

losses recoverable in product liability are those involving personal injury or property damage other than damage to the defective product itself.  Restatement (Third) of Torts:  Products Liability, § 21 cmt. d (1998).

Because Plaintiff in this case claims no personal injury or property damage, and seeks as relief only the amount she expended on the allegedly ineffective products, the "product liability" exception does not remove this cause of action from the scope of the express preemption provision.  *See Mills*, 117 S.W.3d at 494 (holding that the "product liability" exception to § 379r did not apply because the plaintiffs alleged no personal injury or property damage); *Kanter*, 99 Cal. App. 4th at 790-91 (holding that the "product liability" exception to § 379r did not apply because the plaintiffs alleged no personal injury or property damage).

## II.    **Plaintiff's Cause Of Action Is Preempted Because It Conflicts With Regulations Promulgated Under the FDCA.**

Even if Congress had not included an express preemption provision in the FDCA, Plaintiff's claims would be preempted under the doctrine of implied preemption.

Absent explicit preemptive language from Congress, a federal statute may impliedly preempt state law.[9]  *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996); *Sawash v. Suburban Welders Supply Co.*, 553 N.E.2d 894, 896 (Mass. 1990).  A federal statute, for example, may create a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.  *Barnett*

---

[9] It is well accepted that ordinary principles of conflict preemption apply even where there is an express preemption provision that is held inapplicable for whatever reason to a particular case. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869-74 (2000); *Heinricher v. Volvo Car Corp.*, 809 N.E.2d 1094, 1096 (Mass. App. Ct. 2004); *see also Dowhal v. SmithKline Beecham Consumer Healthcare*, 88 P.3d 1, 8-9, 15 (Cal. 2004) (holding that even though the plaintiff's claims were not preempted under § 379r, the claims were preempted under ordinary principles of conflict preemption).

*Bank*, 517 U.S. at 31.  Alternatively, federal law may be in "irreconcilable conflict" with state

law, such that compliance with both statutes is a "physical impossibility," or the state law may

"stand as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress."  *Id.* (internal citations and alterations omitted).  For example, an "irreconcilable

conflict" exists when "state law penalizes what federal law requires."  *See Geier v. Am. Honda

Motor Co.*, 529 U.S. 861, 873 (2000).

   Plaintiff's action would hold Defendants liable under a theory of common law

fraud for marketing a product consistent with a final FDA OTC drug monograph.  The action

would not only contradict the FDA's specific finding of dextromethorphan's effectiveness, but

also would directly conflict with the detailed and specific labeling requirements mandated by the

FDA.  For example, as detailed above, this action would prohibit under state law the statement of

"Indications" in the product labeling that is expressly required under federal law.  *See* discussion

*supra* Argument § I.A.  As such, the state requirement would create an "irreconcilable conflict"

with federal law.  *See Dowhal v. SmithKline Beecham Consumer Healthcare*, 88 P.3d 1, 15 (Cal.

2004) (holding that, even where § 379r did not expressly preempt the action because the

provision does not apply to certain State requirements adopted by public initiative, federal

labeling requirements regarding an OTC drug product that conflicted with state labeling

requirements preempted the plaintiffs' cause of action).

   Even in the absence of a direct conflict, Plaintiff's claim "stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress."  *See Barnett*

*Bank*, 517 U.S. at 31.  Congress granted the FDA the authority to determine the safety and

effectiveness of drugs in order to "protect the public health."  21 U.S.C. § 393(b)(2)(B).  This

lawsuit, however, would permit individual juries across the country to determine whether OTC

drugs are safe and effective and to establish labeling, advertising, and dosing requirements for those products.  This prospect of state-by-state determination of the propriety of OTC drug approvals "is the antithesis of the orderly scheme Congress put in place and charged the FDA with implementing."  *See Horn v. Thoratec*, 376 F.3d 163, 178 (3d Cir. 2004) (holding that the plaintiff's medical device product liability claims were preempted) (internal quotations omitted). "Such uncertainty…would create chaos for both the regulated industry and FDA."  *Id.* (internal quotations omitted).

Furthermore, this lawsuit seeks to establish under Massachusetts law the ineffectiveness of pediatric cough suppressants containing dextromethorphan.  *See* discussion *supra* Argument § I.A.  Under-utilization of a drug that FDA has determined to be effective would deprive patients of beneficial treatment and "could well frustrate the purposes of federal regulation as much as over-utilization" resulting from a failure to ensure a product's effectiveness.  *See Amicus Brief for the United States, Motus v. Pfizer, Inc.*, at 23 (Sept. 3, 2002) (Attached as Ex. D).  This lawsuit also seeks to prohibit manufacturers from including in the labeling and advertising of pediatric dextromethorphan products a statement of "Indications" and directions for pediatric dosing.  *See supra* Argument § I.A.  Prohibiting the dissemination of information for consumers of a product's indications and directions for use would further frustrate the purpose of federal regulation designed to ensure that products are used safely and effectively.

Because Plaintiff's cause of action would create an "irreconcilable conflict" with regulations promulgated under the FDCA, and because it would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," this cause of action is impliedly preempted by the FDCA and the regulations promulgated thereunder.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiff's

Complaint against them be dismissed with prejudice.

Respectfully submitted,

WYETH, INC., a/k/a Wyeth Company f/k/a
American Home Products Corporation

THE PROCTER & GAMBLE
DISTRIBUTING COMPANY

By its attorneys,

By its attorneys,

/s/ Gabrielle R. Wolohojian
Gabrielle R. Wolohojian (BBO #555704)
Edward E. Hale, Jr. (BBO #651272)
WILMER CUTLER PICKERING HALE
   AND DORR LLP
60 State Street
Boston, MA  02109
Tel:  617-526-6000
Fax:  617-526-5000
gabrielle.wolohojian@wilmerhale.com
edward.hale@wilmerhale.com

/s/ John E. Hall
John E. Hall
Michael S. Labson
Wendy M. Ertmer
COVINGTON & BURLING
1201 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: 202-662-5104
Fax: 202-778-5104
jhall@cov.com
mlabson@cov.com
wertmer@cov.com

Edwin F. Landers, Jr. (BBO #559360)
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Tel:  617-439-7583
Fax:  617-342-4967
elanders@morrisonmahoney.com

PFIZER INC. and WARNER-LAMBERT
COMPANY LLC (on behalf of itself and its
unincorporated Parke-Davis Division)

By their attorneys,

/s/ Joseph J. Leghorn
Joseph J. Leghorn (BBO #292440)
J. Christopher Allen, Jr. (BBO #648381)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Tel:  617-345-1000
Fax:  617-345-1300
jleghorn@nixonpeabody.com
callen@nixonpeabody.com

NOVARTIS CORPORATION

By its attorneys,

/s/ Rory FitzPatrick
Rory FitzPatrick (BBO #169960)
Andrew C. Glass (BBO #638362)
Ryan M. Tosi (BBO #661080)
KIRKPATRICK & LOCKHART
    NICHOLSON GRAHAM LLP
75 State Street
Boston, MA  02109
Tel:  617-261-3100
Fax:  617-261-3175
rfitzpatrick@klng.com
aglass@klng.com
rtosi@klng.com

PRESTIGE BRANDS, INC.

By its attorneys,

/s/ Mark J. Hoover
Mark J. Hoover (BBO #564473)
CAMPBELL, CAMPBELL, EDWARDS
    & CONROY, P.C.
One Constitution Center, Third Floor
Boston, MA  02129
Tel:  617-241-3000
Fax:  617-241-5115
mhoover@campbell-trial-lawyers.com

Charles Jolly
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, PC
1800 Republic Centre
633 Chestnut Street
Chattanooga, TN  37450-1800
Tel: 931-946-8071
Fax: 423-756-3447
cjolly@bakerdonelson.com

MCNEIL-PPC, INC.

By its attorneys,

/s/ Joseph F. Shea
Joseph F. Shea (BBO #555473)
Michelle Chassereau Jackson (BBO #654825)
NUTTER MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
Tel:  617-439-2000
Fax:  617-310-9000
jshea@nutter.com
mjackson@nutter.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing document was served upon all counsel of record by electronic service on July 27, 2005.

/s/ John E. Hall
John E. Hall

Exhibit A

Westlaw.

99 Cal.App.4th 780                                                                                                   Page 1
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

▷

SUSAN KANTER et al., Plaintiffs and Appellants,
v.
WARNER-LAMBERT COMPANY et al.,
Defendants and Respondents.
**No. A094975.**

Court of Appeal, First District, Division 1, California.

June 25, 2002.

SUMMARY

In a class action against three manufacturers of over-the-counter drugs for the treatment of head lice, plaintiffs alleged that defendants' product labels contained false and misleading statements about the effectiveness of the drugs. Plaintiffs' claims were based on both state law and the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.). The trial court granted summary judgment for defendants, finding that the claims were preempted by 21 U.S.C. § 379r(a), the preemption provision of the Food and Drug Administration Modernization Act of 1997 (FDAMA). (Superior Court of the City and County of San Francisco, No. 301147, David A. Garcia, Judge.)

The Court of Appeal affirmed. It held that plaintiffs' claims for breach of warranty and fraud were not actions under "the product liability law" within the meaning of 21 U.S.C. § 379r(e), the savings clause of the FDAMA, and thus they did not escape preemption on that basis. The court also held that, although the federal over-the-counter drug monograph system does not require each manufacturer to submit its label for approval, the system nevertheless establishes a federal requirement regarding labeling that can preempt conflicting state requirements under the FDAMA preemption provision. The court held that the trial court correctly concluded that plaintiffs' state law claims were preempted. When a state law claim, however couched, would effectively require a manufacturer to include additional or different information on a federally approved label, it is preempted. As to one of the drugs, plaintiffs' claims were based on the assertion that the approved label was no longer accurate and that the label should be changed or the product banned. Each cause of action would result in the establishment of a state requirement regarding

labeling that would be different from the federally required label. As to the other two drugs, the challenged label statements did nothing more than express in easily understood language what was implicit in the federally mandated labeling. Finally, the court held, plaintiffs were unable to state a claim under the federal Magnuson-Moss Warranty Act. (Opinion by Margulies, J., with Stein, Acting P. J., and Swager, J., concurring.) *781

HEADNOTES

Classified to California Digest of Official Reports

(1) Summary Judgment § 26--Appellate Review--Scope of Review--Statutory Construction.
On appeal after the granting of summary judgment, the appellate court conducts de novo review of any underlying issues of statutory construction.

(2) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Presumption Against Preemption.
Under the supremacy clause of the federal Constitution, when a state statute, administrative rule, or common law cause of action conflicts with a federal statute, the state law, rule, or cause of action is without effect. Consideration of issues arising under the supremacy clause starts with the presumption that state laws are not to be preempted by a federal statute unless it is the clear and manifest purpose of Congress to do so.

(3) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Express Preemption.
The intent of Congress with respect to preemption may be explicitly stated in the language of a statute or implicitly contained in its structure and purpose. When Congress has enacted a provision expressly addressing preemption, and when that provision provides a reliable indication of congressional intent as to state authority, it governs the preemptive scope of the legislation. The plain wording of an express preemption provision necessarily provides the best evidence of that intent.

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                                  Page 2
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

(4a, 4b, 4c) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Drug Labeling:Products Liability § 51-- Strict Liability in Tort--Damages--Requirement of Personal or Property Damage.

In a class action against three manufacturers of over-the-counter drugs for the treatment of head lice, in which plaintiffs alleged that the product labels contained false and misleading statements about the effectiveness of the drugs, plaintiffs' claims for breach of warranty and fraud were not actions under "the product liability law" within the meaning of 21 U.S.C. § 379r(e), the savings clause of the Food and Drug Administration Modernization Act of 1997, and thus they did not escape preemption under 21 U.S.C. § 379r(a). Under the products liability law of *782 California, injury to the plaintiff from a defective product is an essential element of a cause of action; if the damage is solely economic, recovery on a products liability theory is unavailable. Plaintiffs' complaint did not allege any personal or property injury. Their broader interpretation of "product liability law" would be inconsistent with the fundamental principle that a savings clause should not be interpreted in such a way as to undercut or dilute an express preemption clause.

(5) Statutes § 30--Construction--Language--Literal Interpretation; Plain Meaning Rule.

The starting point for the interpretation of a statute is its language. If that language is plain and unambiguous, there is no need for judicial construction. Instead, the court's sole function is to enforce the statute according to its terms.

(6) Statutes § 42--Construction--Aids--Where Statute Is Unambiguous.

When a statute is unambiguous, its language cannot be expanded or contracted by the statements of individual legislators or committees during the course of the legislative process.

(7) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Drug Labeling--Federal Drug Monograph System.

Although the federal over-the-counter drug monograph system does not require each manufacturer to submit its label for approval, the system nevertheless establishes a federal requirement regarding labeling that can preempt conflicting state requirements under 21 U.S.C. § 379r(a), the preemption provision of the Food and Drug Administration Modernization Act of 1997.

(8) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Drug Labeling--State Claims Based on Inaccurate Labeling.

In a class action against three manufacturers of over-the-counter drugs for the treatment of head lice, in which plaintiffs alleged that the product labels contained false and misleading statements about the effectiveness of the drugs, the trial court did not err in concluding that plaintiffs' state law claims were preempted under 21 U.S.C. § 379r(a), the preemption provision of the Food and Drug Administration Modernization Act of 1997. When a state law claim, however couched, would effectively require a manufacturer to include additional or different information on a federally approved label, it is preempted. As to one of the drugs, plaintiffs' claims were based on the assertion that the approved label *783 was no longer accurate and that the label should be changed or the product banned. Each cause of action would result in the establishment of a state requirement regarding labeling that would be different from the federally required label. As to the other two drugs, the challenged label statements did nothing more than express in easily understood language what was implicit in the mandatory labeling.

[See 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 11; West's Key Number Digest, Products Liability ⟨key⟩ 46.2, West's Key Number Digest, States ⟨key⟩ 18.15.]

(9) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Drug Labeling--Warranty Claims:Products Liability § 17-- Breach of Warranty--Federal Preemption.

In a class action against three manufacturers of over-the-counter drugs for the treatment of head lice, in which plaintiffs alleged that the product labels contained false and misleading statements about the effectiveness of the drugs, plaintiffs failed to state a claim under the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.). The act is expressly inapplicable to any written warranty that is otherwise governed by federal law, and the labeling at issue in

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                                                                Page 3
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

this case was governed by the federal Food, Drug, and Cosmetic Act (FDCA; 21 U.S.C. § 301 et seq.) and its implementing regulations. Further, the warranty act applies only to consumer products, and a drug regulated under the FDCA is not a consumer product. Moreover, state law applies in breach of warranty actions as to both implied and written warranty claims under the federal warranty act, except as expressly stated in that act. Plaintiffs' express-warranty state law claims were preempted under 21 U.S.C. § 379r(a), the preemption provision of the Food and Drug Administration Modernization Act of 1997, and this meant that they were also unable to state a claim under the federal act.

### COUNSEL

Zelle, Hofmann, Voelbel, Mason, & Gette, Daniel S. Mason, Joseph W. Bell, Dan Zoloth Dorfman; Gordon-Creed, Kelley, Holl & Sugerman, Kevin J. Holl and Jeremy Sugerman for Plaintiffs and Appellants.

Kaye Scholer, Jeffrey S. Gordon, David Klingsberg, Thomas A. Smart and Richard A. DeSevo for Defendants and Respondents Warner-Lambert Company and Pfizer Inc. *784

Sedgwick, Detert, Moran & Arnold, Michael F. Healy and Wayne A. Wolff for Defendant and Respondent Care Technologies, Inc.

### MARGULIES, J.

Plaintiffs Susan Kanter and Sharlon Plunk sued defendants Warner-Lambert Company, Pfizer Inc., and Care Technologies, Inc., the manufacturers of NIX, RID, and CLEAR, over-the-counter drugs for the treatment of head lice. Framed as a class action, the complaint alleged that the product labels contain false and misleading statements about the effectiveness of the drugs. The complaint contained several state law claims, including breach of express warranty and false advertising, and a claim for breach of written warranty under the federal Magnuson-Moss Warranty Act. Plaintiffs sought refunds of the purchase price of the drugs, an order banning their sale in their current formulations or requiring their relabeling, and other related relief.

The question in this appeal is not whether the allegations of plaintiffs' complaint have merit, but whether their claims are preempted by federal law. The trial court granted summary judgment for defendants on the ground that the claims were expressly preempted by title 21 of the United States Code section 379r(a), a provision of the Food and Drug Administration Modernization Act of 1997 (FDAMA) (Pub.L. No. 105-115) (Nov. 21, 1997) 111 Stat. 2296). We agree with the trial court and affirm the judgment.

#### Factual and Procedural Background
#### A. *Approval of New Drugs by the Food and Drug Administration*

Familiarity with the procedures of the federal Food and Drug Administration (FDA) for approving the marketing of drugs is a prerequisite to an understanding of the facts, issues, and arguments in this appeal. Under the Federal Food, Drug, and Cosmetic Act (FDCA) (21 U.S.C. § 301 et seq.), a drug manufacturer is prohibited from marketing a new drug unless the FDA has approved the drug as both safe and effective for its intended use. [FN1] (§ 355(a); see generally *Weinberger v. Hynson, Westcott & Dunning* (1973) 412 U.S. 609, 612-613 [93 S.Ct. 2469, 2474-2475, 37 L.Ed.2d 207].)

> FN1 Unless otherwise indicated, all section references are to title 21 of the United States Code.

A manufacturer seeking approval of a new drug must submit a detailed new drug application in accordance with the requirements of the FDCA and related regulations promulgated by the FDA. (§ 355(b)(1); *785 21 C.F.R. § § 314.1-314.3, 314.50 (2001).) Among other information, a new drug application must include "substantial evidence" that the drug is safe and effective, meaning "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." (§ 355(d); see 21 C.F.R. § 314.126 (2001) [explaining characteristics of "adequate and well-controlled study"].)

A new drug application must also include "specimens" of the labeling proposed for the drug. (§ 355(b)(1)(F); see 21 C.F.R. § § 314.50(c)(2)(i) (2001) [application must include proposed text of labeling], 201 et seq. (2001) [general labeling

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                    Page 4
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
(Cite as: 99 Cal.App.4th 780)

provisions].) If the FDA determines that the labeling of a new drug is false or misleading in any particular, the drug is deemed "misbranded." Whether labeling is false or misleading depends not only on its stated or suggested representations, but also on the extent to which it fails to reveal any material facts. (§ § 352(a), 321(n).) The application will be refused if the FDA determines that the labeling is false or misleading in any particular, if the application contains an untrue statement of a material fact, or if the proposed labeling does not comply with the requirements established in the regulations. (§ 355(d)(7); 21 C.F.R. § 314.125(b)(6), (7), (8) (2001).)

After a new drug application has been approved, any change in the labeling requires a supplement to an application and approval by the FDA, either before or after the change. (21 C.F.R. § § 314.70(b), (c), 314.71 (2001).) Furthermore, the FDA has the power to withdraw its approval of a drug for reasons related to its safety or effectiveness, including a determination by that agency on the basis of new evidence that the drug does not have the effect represented or suggested on its labeling or that the labeling is false and misleading in any particular. (§ 355(e); 21 C.F.R. § 314.150(a)(2)(iii), (iv), (b)(3) (2001).)

The FDCA expressly prohibits the manufacture and distribution of any misbranded drug (§ 331(a), (b), (c), (g), (k)), and it authorizes the United States to bring enforcement actions seeking injunctive relief and civil or criminal penalties. (§ § 332-334.) But it does not create a private cause of action for violation of its provisions. (§ 337(a); In re Orthopedic Bone Screw Products (3d Cir. 1999) 193 F.3d 781, 788.) *786

B. Monographs for Over-the-counter Drugs
The FDA has adopted another system for evaluating whether the hundreds of thousands of over-the-counter drugs available to consumers are safe, effective, and not misbranded. Under the over-the-counter drug monograph system, the FDA appoints advisory review panels of qualified experts to evaluate the safety and effectiveness of over-the-counter drugs, to review their labeling, and to advise on the promulgation of monographs establishing conditions under which particular categories of over-the-counter drugs can be marketed. [FN2] (21 C.F.R. § § 330.1, 330.10(a) (2001); id., § 330.14(a) (2002); see generally Weinberger v. Bentex Pharmaceuticals, Inc. (1973) 412 U.S. 645, 650-651 [93 S.Ct. 2488,

2492-2493, 37 L.Ed.2d 235]; Cutler v. Hayes (D.C. Cir. 1987) 818 F.2d 879, 882-884.) The FDA publishes proposed and tentative final monographs for public review and comment, and eventually promulgates a final monograph in the form of regulations in the Code of Federal Regulations. Those regulations establish conditions under which a category of over-the-counter drugs is recognized as safe and effective and not misbranded. (21 C.F.R. § 330.10 (2001); see Cutler v. Hayes, supra, at p. 884.)

FN2 The term "monograph" has been defined as "a learned detailed thoroughly documented treatise covering exhaustively a small area of a field of learning." (Webster's 3d New Internat. Dict. (1986) p. 1462.)

An over-the-counter drug is generally recognized as safe and effective and not misbranded if it meets each condition in the regulations governing such drugs and in any applicable monograph. (21 C.F.R. § 330.1 (2001).) The regulations for all over-the-counter drugs include labeling requirements. Under the heading "Uses," the label must "contain the labeling describing the ' Indications' that have been established in an applicable [over-the-counter] drug monograph or alternative truthful and nonmisleading statements describing only those indications for use that have been established in an applicable monograph ...." (21 C.F.R. § 330.1(c)(2) (2001).) Another general regulation provides that the labeling of over-the-counter drugs must be "clear and truthful in all respects and may not be false or misleading in any particular." Labeling must state intended uses and results, directions for proper use, and warnings against unsafe use, side effects, and adverse reactions "in such terms as to render them likely to be read and understood by the ordinary individual, including individuals of low comprehension, under customary conditions of purchase and use." (21 C.F.R. § 330.10(a)(4)(v) (2001).)

Under the regulations, "[a]ny product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." (21 C.F.R. § 330.10(b) (2001).) *787

C. FDA Approval of NIX
Defendant Warner-Lambert Company (Warner-Lambert) manufactures NIX, now marketed as an over-the-counter product for the treatment of head lice. In 1986, the FDA approved a new drug application for NIX to be sold as a prescription drug. The description section of the approved labeling for

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                                                Page 5
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
(Cite as: 99 Cal.App.4th 780)

the product described NIX as "a topical pediculicide and ovicide for the treatment of infestation with *Pediculus humanus* var. *capitis* (the head louse) and its nits (eggs)." The indications and usage section of that label stated: "Nix is indicated for the single-application treatment of infestation with *Pediculus humanus* var. *capitis* (the head louse) and its nits (eggs)."

In 1990, the FDA approved a new drug application allowing the sale of NIX as an over-the-counter product. The indications section of the approved labeling stated: "For the treatment of head lice." The product benefits section of that label stated in part: "Nix Creme Rinse kills lice and their unhatched eggs with only one application. Nix protects against head lice reinfestation for a full 14 days." The directions section of the label stated in pertinent part: "A single application is sufficient. Retreatment is required in less than 1% of patients. If live lice are observed seven days or more after the first application of this product, a second treatment should be given." The approved label for the front panel of the package stated:

> "One Application
> "Kills Lice & Their Eggs
> "Prevents Reinfestation"

For the entire period covered by plaintiffs' complaint, the FDA-approved labeling for NIX stated that the product was indicated "[f]or the treatment of head lice" and that the product "[k]ills lice and their eggs."

### D. *RID and CLEAR and the Pediculicide Drug Monograph*

In 1993, the FDA issued a final monograph for over-the-counter pediculicide drug products for the treatment of head, pubic, and body lice, specifying the sole active ingredients for such products and establishing other conditions under which they are "generally recognized as safe and effective and not misbranded." (58 Fed.Reg. 65452-01 (Dec. 14, 1993).) That monograph, which appears as parts 358.601 through 358.650 in title 21 of the Code of Federal Regulations, provides that an over-the-counter pediculicide drug product in a form suitable for topical application is generally recognized as safe and effective and is not misbranded if it meets each condition in the monograph and each general condition in part 330.1 of title 21 of **788** the Code of Federal Regulations. (21 C.F.R. § 358.601(a) (2001).) With respect to labeling, the monograph requires the product to state, under the heading

"*Indications*," the following: " 'For the treatment of head, pubic (crab), and body lice.' " It also requires the product to state, under the heading "*Directions*," the following: " 'A fine-toothed comb or a special lice/nit removing comb may be used to help remove dead lice or their eggs (nits) from hair. A second treatment must be done in 7 to 10 days to kill any newly hatched lice.' " (21 C.F.R. § 358.650(b), (d)(2), (3) (2001).)

Defendants Pfizer Inc. (Pfizer) and Care Technologies, Inc. (Care) manufactured and sold RID and CLEAR, respectively. It is undisputed that RID and CLEAR are pediculicides within the meaning of the monograph and that their labeling includes the statements that the monograph requires.

### E. *Plaintiffs' Lawsuit*

Plaintiffs filed a complaint for damages and injunctive relief against Warner-Lambert, Pfizer, and Care. [FN3] The complaint, a putative class action, alleged that NIX, RID, and CLEAR have become ineffective because head lice have developed resistance to the insecticides in the products, but that defendants continue to represent to consumers that the products are effective in killing lice and their eggs.

> FN3 Plaintiffs also named Hogil Pharmaceuticals Corporation, the manufacturer of a product called A-200, as a defendant, but the action against that defendant was automatically stayed after it filed bankruptcy proceedings. (See 11 U.S.C. § 362.)

The complaint alleged breach of written warranty under the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.) and several state causes of action: breach of express warranty (Cal. U. Com. Code, § 2313), fraud and deceit (Civ. Code, § § 1709, 1710), false advertising (Bus. & Prof. Code, § 17500), unfair competition (Bus. & Prof. Code, § 17200 et seq.), and violations of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.). Plaintiffs sought compensatory damages consisting of all amounts paid by class members for the products, an order enjoining the sale of the products in their current formulations or requiring a warning on the labels that head lice have become resistant to the products, punitive damages, and attorney fees.

The trial court granted summary judgment in favor of defendants on the ground that all of plaintiffs'

99 Cal.App.4th 780                                                                                                    Page 6
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases  P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

causes of action were expressly preempted by section 379r, a provision of the FDAMA. *789

## Discussion

### A. *Introduction*

(1) On appeal after the granting of summary judgment, this court conducts de novo review of any underlying issues of statutory construction. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 683 [102 Cal.Rptr.2d 97, 13 P.3d 704]; see, e.g., *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 321-322 [93 Cal.Rptr.2d 36, 993 P.2d 366].) Therefore we undertake an independent consideration of the meaning and scope of the federal preemption provision, section 379r.

(2) Under the supremacy clause of the United States Constitution, "[w]hen a state statute, administrative rule, or common-law cause of action conflicts with a federal statute, it is axiomatic that the state law is without effect. [Citations.]" (*Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 894 [120 S.Ct. 1913, 1932, 146 L.Ed.2d 914] (dis. opn. of Stevens, J.) (*Geier*).) Consideration of issues arising under that clause starts with the presumption that state laws are not to be preempted by a federal statute unless it is the clear and manifest purpose of Congress to do so. (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407] (*Cipollone*).)

(3) The intent of Congress with respect to preemption may be explicitly stated in the language of a statute or implicitly contained in its structure and purpose. When Congress has enacted a provision expressly addressing preemption, and when that provision provides a reliable indication of congressional intent as to state authority, it governs the preemptive scope of the legislation. (*Cipollone, supra,* 505 U.S. at pp. 516-517 [112 S.Ct. at pp. 2617-2618].) The plain wording of an express preemption provision necessarily provides the best evidence of that intent.

The FDAMA is comprehensive and far-reaching legislation that amended the FDCA and other federal statutes "to improve the regulation of food, drugs, devices, and biological products, and for other purposes." (Pub.L. No. 105-115 (Nov. 21, 1997) 111 Stat. 2296.) Under the heading "National uniformity for nonprescription drugs," the FDAMA includes an express preemption provision relating to nonprescription or over-the-counter drugs, which provides in relevant part: "Except as provided in

subsection ... (e) ... of this section, no State ... may establish or continue in effect any *requirement*- [¶ ] (1) that relates to the regulation of a [nonprescription] drug ...; and [¶ ] (2) that is different from or in addition to, or that is otherwise not identical with, a *requirement* under this Act ...." (§ 379r(a), *790 italics added.) Subsection (e) of section 379r is a savings clause, stating, "Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State."

### B. *The Savings Clause*

(4a) Plaintiffs argue initially that it is unnecessary to consider whether any of their claims would result in conflicting state and federal requirements within the meaning of section 379r(a) because their action escapes preemption under the savings clause. They contend that their claims for breach of warranty and fraud are actions under "product liability law" within the meaning of that clause. (§ 379r(e).) The argument is without merit.

(5) Settled principles of statutory construction govern our analysis. The starting point for the interpretation of a statute is its language. (*Kaiser Aluminum & Chemical Corp. v. Bonjorno* (1990) 494 U.S. 827, 835 [110 S.Ct. 1570, 1575-1576, 108 L.Ed.2d 842]; *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777 [63 Cal.Rptr.2d 859, 937 P.2d 290].) If that language is plain and unambiguous, there is no need for judicial construction. Instead, a court's sole function is to enforce the statute according to its terms. (*United States v. Ron Pair Enterprises, Inc.* (1989) 489 U.S. 235, 240-241 [109 S.Ct. 1026, 1029-1030, 103 L.Ed.2d 290]; *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641].)

(4b) The savings clause states plainly and unambiguously that the preemption provisions of the section do not affect "the product liability law of any State." (§ 379r(e).) Under the product liability law of California, injury to the plaintiff from a defective product is an essential element of a cause of action. (See, e.g., *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1110 [56 Cal.Rptr.2d 162, 920 P.2d 1347]; *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 127-131 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].) Liability may be imposed either for personal injury or for physical damage to property, but if the damage

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

consists solely of econo mic losses, recovery on a products liability theory is unavailable. (*Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 18-19 [45 Cal.Rptr. 17, 403 P.2d 145]; *Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 293 [204 Cal.Rptr. 736], and cases cited.)

Plaintiffs acknowledge that their complaint does not allege any personal injury or injury to property as a result of using defendants' products. They *791 argue, however, that Congress intended "product liability law" within the meaning of section 379r(e) to have a broader meaning, encompassing an expansive category of state common law and statutory actions imposing liability on commercial sellers of products. The argument is inconsistent with the fundamental principle that a savings clause should not be interpreted in such a way as to undercut or dilute an express preemption clause. (*American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214, 227-228 [118 S.Ct. 1956, 1965-1966, 141 L.Ed.2d 222]; *Etcheverry v. Tri-Ag Service, Inc., supra,* 22 Cal.4th at p. 328.) Reading the savings clause as plaintiffs suggest would make the express preemption provisions of section 379r(a) a nullity, and we will not presume that Congress included superfluous provisions or otherwise engaged in an idle act when it enacted the statute. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 634 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

Plaintiffs also claim that certain congressional committee reports and comments of individual senators support their theory that the term "product liability law" in the savings clause can be stretched to include statutory causes of action such as breach of warranty. (6) When a statute is unambiguous, however, its language cannot "be expanded or contracted by the statements of individual legislators or committees during the course of the [legislative] process." (*West Virginia Univ. Hospitals, Inc. v. Casey* (1991) 499 U.S. 83, 98-99 [111 S.Ct. 1138, 1146-1147, 113 L.Ed.2d 68].) (4c) Furthermore, legislative history actually contradicts plaintiffs' reading of the phrase as encompassing statutory causes of action and instead confirms its plain meaning. Commenting on the scope of the savings clause, the Senate committee report on the FDAMA states, "Finally, the legislation explicitly provides that it shall not be construed to modify or otherwise affect the *traditional* product liability law of any State. *Tort liability rules and requirements would remain

*unchanged and unaffected.*" (Sen. Rep. No. 105-43, 1st Sess., p. 66 (1997), italics added.) Plaintiffs have not alleged a cause of action under the traditional product liability law of this state, and the savings clause does not exempt their claims from preemption.

### C. *The Existence of Federal Requirements*
Plaintiffs contend that even if the savings clause does not apply, their claims are not preempted because none of their claims about labeling would result in establishment of a state "requirement" different from an applicable federal "requirement" within the meaning of section 379r(a).

As a threshold matter, we must determine whether the statutes and regulations applicable to the labeling of defendants' products establish a federal *792 requirement that can have preemptive effect. Similar references to conflicting state and federal "requirements" appear in other federal preemption provisions, and courts have labored to ascertain the precise meaning of those references.

In *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470 [116 S.Ct. 2240, 135 L.Ed.2d 700] (*Medtronic*), the United States Supreme Court considered a preemption provision of the Medical Device Amendments of 1976 (MDA) (§ 360 et seq.). That act classifies and regulates medical devices based on the risk posed to the public, with the most strictly regulated designated class III. Before a new class III device may be marketed, the manufacturer ordinarily must provide the FDA with " 'reasonable assurance' " that the device is safe and effective by complying with a thorough, rigorous, and costly premarket approval process. (*Medtronic, supra,* at pp. 476-477 [116 S.Ct. at pp. 2246-2247].) Under an exception to that process, the MDA also permits devices to be marketed on a showing that they are "substantially equivalent" to devices already on the market before its effective date. (§ 360e(b)(1)(B).) The question in *Medtronic* was whether the MDA preempted a plaintiff's tort claims against the manufacturer of an allegedly defective pacemaker, which had been approved by the FDA under the less stringent "substantially equivalent" procedure. (*Medtronic,* at pp. 480-481 [116 S.Ct. at p. 2248].)

The express preemption provision of the MDA stated in pertinent part that no state may establish with respect to a device "any requirement" that is "different from, or in addition to, any requirement applicable under this chapter to the device," and "which relates to the safety or effectiveness of the

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                    Page 8
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

device ...." (§ 360k(a)(1), (2).) The provision was supplemented by an FDA regulation, providing in part that state requirements were preempted only when the agency had established specific counterpart regulations or other specific requirements applicable to a particular device. (21 C.F.R. § 808.1(d) (2001).)

A majority of the court in *Medtronic* agreed that a state "requirement" within the meaning of the provision could encompass state common law actions as well as causes of action based on state statutes. (See *Medtronic, supra,* 518 U.S. at pp. 502-503 [116 S.Ct. at pp. 2258-2259] (plur. opn. of Stevens, J.); see *id.* at pp. 503-505 [116 S.Ct. at pp. 2259-2260] (conc. opn. of Breyer, J.); see *id.* at pp. 509-512 [116 S.Ct. at pp. 2262-2263] (conc. & dis. opn. of O'Connor, J.); *Geier, supra,* 529 U.S. at p. 867 [120 S.Ct. at pp. 1917- 1918].)

Nevertheless, the court held in a five-to-four decision that none of the plaintiff's common law tort claims were preempted by the MDA. *793 (*Medtronic, supra,* 518 U.S. at pp. 501-502 [116 S.Ct. at pp. 2258-2259].) While the justices disagreed over the nature of a state requirement, they were unanimous in their view that the "substantially equivalent" procedure was not a federal "requirement" specifically applicable to the particular device in question within the meaning of section 360k(a). (*Medtronic, supra,* at pp. 498-500 [116 S.Ct. at pp. 2256-2258] (maj. opn. of Stevens, J.); see *id.* at p. 508 [116 S.Ct. at pp. 2261-2262] (conc. opn. of Breyer, J.); see *id.* at p. 513 [116 S.Ct. at pp. 2263-2264] (conc. & dis. opn. of O'Connor, J.) [FN4] The court contrasted the "generality" of the federal labeling and manufacturing requirements under the "substantially equivalent" procedure with circumstances in which the federal government has "weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." The generic requirements under the "substantially equivalent" procedure did not reflect "the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements." (*Medtronic, supra,* 518 U.S. at p. 501 [116 S.Ct. at p. 2258].)

FN4  For a detailed discussion of the majority, plurality, and concurring and

dissenting opinions in *Medtronic, supra,* 518 U.S. 470, see *Martin v. Medtronic, Inc.* (5th Cir. 2001) 254 F.3d 573, 578-579; *Kemp v. Medtronic, Inc.* (6th Cir. 2000) 231 F.3d 216, 223-225; *Mitchell v. Collagen Corp.* (7th Cir. 1997) 126 F.3d 902, 907-910; *Steele v. Collagen Corp.* (1997) 54 Cal.App.4th 1474, 1480-1489 [63 Cal.Rptr.2d 879].)

Subsequently, several courts have contrasted the procedure at issue in *Medtronic, supra,* 518 U.S. 470, with the MDA's more stringent premarket approval process and concluded that the latter is a device-specific federal requirement that can preempt conflicting state requirements. (*Martin v. Medtronic, Inc., supra,* 254 F.3d at pp. 583-584; *Kemp v. Medtronic, Inc., supra,* 231 F.3d at pp. 226-228; *Mitchell v. Collagen Corp, supra,* 126 F.3d at pp. 911-912; *Steele v. Collagen Corp., supra,* 54 Cal.App.4th at pp. 1487- 1488.) Those courts have reasoned that the process constitutes approval of a specific product's design, testing, intended use, manufacturing methods, performance standards, and labeling, and that state law claims based on a theory that the product is mislabeled would impermissibly add requirements different from or in addition to those established by the federal procedure. (*Martin v. Medtronic, Inc., supra,* 254 F.3d at pp. 584-585; *Mitchell v. Collagen Corp., supra,* 126 F.3d at pp. 913-914.)

The parallels between the premarket approval process for medical devices and the new drug application process with respect to product labeling are *794 striking. For instance, both require submission to the FDA of the proposed labeling, which must comply with FDA regulations. (§ § 360e(c)(1)(F), 355(b)(1)(F); see 21 C.F.R. § 201 et seq. (2001) [drug labeling]; *id.,* § 801.1 et seq. (2001) [medical device labeling].) The FDA will deny approval of the drug or device if there is an insufficient showing that it is safe and effective under the conditions of use stated or suggested in the proposed labeling, or if that labeling is misleading in any particular, untrue, or otherwise not in compliance with the regulatory requirements for labels. (§ § 360e(d)(2)(A), (B), (D), 355(d)(5), (6), (7); 21 C.F.R. § § 814.45(a)(2), 314.125(b)(6), (7), (8) (2001).) After approval, changes in the labeling generally require a supplementary application and approval by the FDA. (21 C.F.R. § § 814.39, 314.70, 314.71 (2001).) The FDA has the power to withdraw approval of a new medical device or drug

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                         Page 9
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

permanently or temporarily if it determines on the basis of new evidence that the device or drug is not effective as represented on its labeling. (§ § 360(e), 355(e).) The substantial similarity between the premarket approval and new drug application processes compels the conclusion that the latter also establishes a federal requirement with respect to labeling that can have preemptive effect.

(7) Although the over-the-counter drug monograph system does not require each manufacturer to submit its label for approval, we conclude that system also establishes a federal requirement regarding labeling that can preempt conflicting state requirements. On the effect of that system, *Papike v. Tambrands Inc.* (9th Cir. 1997) 107 F.3d 737 is instructive. The issue in *Papike* was whether a plaintiff's state law claims for failure to warn of the risk of toxic shock syndrome related to tampon use were preempted by the MDA. That act classifies tampons as class II medical devices involving some risk of injury. Their manufacturers must comply with FDA regulations known as "special controls," including a regulation specifying detailed information that tampon labels must contain about toxic shock syndrome. (§ 360c(a)(1)(B); 21 C.F.R. § § 860.3(c)(2), 801.430(b) (2001).) The plaintiff argued that the regulation was too general to warrant preemption because it allowed manufacturers latitude in the wording, style, and placement of the consumer information, but the appellate court disagreed. It reasoned that unlike the general requirements at issue in *Medtronic, supra,* 518 U.S. 470, the tampon warning regulation reflected " 'the sort of concerns regarding a specific device or field of device regulation which the ... regulations were designed to protect from potentially contradictory state requirements.' [Citation.]" (*Papike v. Tambrands Inc., supra,* 107 F.3d at pp. 740-741.) The court held that although the tampon regulation provided some flexibility to the manufacturer, it mandated the specific substantive content of the warning on the labeling, thereby preempting state law claims or causes of action based on a theory that the warnings were inadequate. (*Id.* at pp. 741-742.) *795

We apply the same analysis here. The monograph at issue is specific to pediculicides and sets forth explicit and detailed federal requirements regarding the content of their labels, thereby preempting state law claims that would result in the imposition of different or contradictory labeling.

### D. *Plaintiffs' Claims*
(8) We turn to the question of whether plaintiffs'

claims are in fact preempted by the foregoing federal requirements.

Plaintiffs argue that their claims for breach of express warranty are not preempted because certain of defendants' representations about their products are voluntary warranties, not statements that federal law required. With respect to NIX, plaintiffs insist that the FDA's approval of that product's label does not mean that the agency required Warner-Lambert to state on the label that one application "Kills Lice & Their Eggs [and] Prevents Reinfestation."

Similar arguments have been made by plaintiffs in cases involving the preemption provision of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. § 136 et seq.). Under that act, the Environmental Protection Agency (EPA) must approve the labels for pesticides and other products, and states are expressly prohibited from imposing "any requirements for labeling or packaging in addition to or different from those required" under the act. (7 U.S.C. § § 136a(c)(5), 136v(b).)

Courts considering that preemption provision have held that express warranty claims based on statements made outside the context of approved labeling or packaging, such as claims made orally or in advertising materials, are not necessarily preempted. (*Etcheverry v. Tri-Ag Service, Inc., supra,* 22 Cal.4th at pp. 335-337 [state law claims based on off-label statements addressing matters outside the scope of the approved label are not preempted]; *Sun Valley Packing v. Consep, Inc.* (2001) 94 Cal.App.4th 315, 318 [114 Cal.Rptr.2d 237] [FIFRA does not preempt a claim that is not label-based, such as an oral warranty based on a use contrary to the label instructions]; *Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 711-712 [110 Cal.Rptr.2d 722].)

But when a state law claim, however couched, would effectively require a manufacturer to include additional or different information on a federally approved label, it is preempted. (*Etcheverry v. Tri-Ag Service, Inc., supra,* 22 Cal.4th at p. 335; *Sun Valley Packing v. Consep, Inc., supra,* 94 Cal.App.4th at p. 321; *796Welchert v. American Cyanamid, Inc.* (8th Cir. 1995) 59 F.3d 69 [express warranty claim based entirely on herbicide's label statement preempted]; *Taylor v. AZ Industries v. Pure-Gro* (9th Cir. 1995) 54 F.3d 555, 560 [failure-to-warn claims preempted to extent they required additional information on labels].) Although FIFRA does not prescribe the

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                      Page 10
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases  P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

exact content of a label, manufacturers are not free to create labels in any manner they choose; instead, the EPA approves the label only after careful and rigorous review of the product data and the draft label. Thus when a claim is premised ultimately on the inadequacy of the product label, it is preempted. (*Taylor AG Industries v. Pure-Gro, supra*, 54 F.3d at pp. 560-561.)

Warner-Lambert also was not free to devise any label of its choosing for NIX. As we have explained in some detail, the proposed label for NIX was reviewed as part of the demanding new drug application process, and the FDA's approval of that application was contingent on the use of the language in the proposed label, with certain changes specified by the FDA. Plaintiffs' complaint alleges several causes of action or claims regarding NIX: breach of express warranty, fraud and deceit, false advertising, unfair competition, and violations of the Consumer Legal Remedies Act. While the legal theories underlying these causes of action may differ, each is bottomed on the assertion that this approved label is no longer accurate or adequate and that the label should be changed or the product banned. Each cause of action would result in the establishment of a state requirement regarding labeling that would be "different from" and "otherwise not identical with" the federally required label (§ 379r(a)), and each is therefore preempted.

Plaintiffs make a related argument about their express warranty claims against Pfizer and Care. They argue that although the monograph for pediculicides mandates a statement that the product is for the "treatment" of head lice, it does not require the additional statements made by defendants, namely, that RID "kills lice & their eggs," and is a "lice killing shampoo," and that CLEAR "[w]orks fast to kill lice and their eggs."

Plaintiffs do not mention that under the monograph, a pediculicide label must also state: " 'A fine-toothed comb or a special lice/nit removing comb may be used to help remove *dead* lice or their eggs (nits) from hair. A second treatment must be done in 7 to 10 days to *kill* any newly hatched lice.' " (21 C.F.R. § 358.650(b), (d)(2), (3) (2001), italics added.) Plaintiffs also fail to take into account the general regulations governing labeling of all over-the-counter drugs, which provide that the label must contain the indications established in the applicable monograph "*or alternative truthful and nonmisleading statements*" describing those indications. (21 C.F.R. §

330.1(c)(2) (2001), italics added.) In addition, those general regulations *797 require labeling to state intended uses and results and other matters "in such terms as to render them likely to be read and understood by the ordinary individual, including individuals of low comprehension, under customary conditions of purchase and use." (21 C.F.R. § 330.10(a)(4)(v) (2001).)

If treatment results in "dead" lice and nits and a second treatment may be necessary to "kill" newly hatched lice, the only possible conclusion is that the "treatment" of lice is the killing of lice. The challenged statements on the RID and CLEAR labels referring to the killing of lice do nothing more than express in direct, straightforward, and easily understood language that which is implicit in the mandatory labeling. The challenged statements are simply alternative explanations of the information that must be included under the monograph, not express warranties of benefits or results outside the scope of that federal requirement.

Because all of plaintiffs' state law causes of action regarding RID and CLEAR-breach of express warranty, fraud and deceit, false advertising, unfair competition, and violations of the Consumer Legal Remedies Act-are also based ultimately on the assertion that the labels on those products are no longer accurate or adequate, they too cannot escape preemption.

Our conclusion that all of plaintiffs' state law claims are expressly preempted by section 379r(a) makes it unnecessary to consider the theory of conflict preemption, under which state law is preempted to the extent that it actually conflicts with federal law, making it impossible to comply with both state and federal requirements. (See *Peatros v. Bank of America* (2000) 22 Cal.4th 147, 158 [91 Cal.Rptr.2d 659, 990 P.2d 539].)

**E. *The Magnuson-Moss Warranty Act***

(9) For several reasons, plaintiffs cannot state a claim under the federal Magnuson-Moss Warranty Act (Magnuson-Moss) (15 U.S.C. § 2301 et seq.). First, Magnuson-Moss is expressly "inapplicable to any written warranty the making or content of which is otherwise governed by Federal law" (15 U.S.C. § 2311(d)). As we have discussed, the FDCA and its implementing regulations govern the labeling at issue here.

Furthermore, Magnuson-Moss applies only to

Copr. © Bancroft-Whitney and West Group 1998

99 Cal.App.4th 780                                                                                          Page 11
99 Cal.App.4th 780, 122 Cal.Rptr.2d 72, 2002-1 Trade Cases  P 73,740, 48 UCC Rep.Serv.2d 544, Prod.Liab.Rep.
(CCH) P 16,378, 02 Cal. Daily Op. Serv. 5720, 2002 Daily Journal D.A.R. 7185
**(Cite as: 99 Cal.App.4th 780)**

"consumer product[s]," defined as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes ...." (15 U.S.C. § 2301(1).) The act does not otherwise enumerate products within the scope of the definition. The federal Consumer Product Safety Act (15 U.S.C. § 2051 et seq.), however, expressly states that "drugs, *798 devices, or cosmetics" as defined in the FDCA are not "consumer product[s]." (15 U.S.C. § 2052(a)(1)(H).) Reading these statutes together, at least two courts have concluded that a medical device regulated by the MDA is not a consumer product within the meaning of Magnuson-Moss. (*Goldsmith v. Mentor Corp.* (D.N.H. 1995) 913 F.Supp. 56, 63; *Kemp v. Pfizer, Inc.* (E.D.Mich. 1993) 835 F.Supp. 1015, 1024-1025.) By parity of reasoning, a drug regulated by the FDCA is also not a consumer product within the meaning of Magnuson-Moss.

Finally, it has been held that state law applies in breach of warranty actions as to both implied and written warranty claims under Magnuson-Moss, except as expressly stated by that act. (*Carlson v. General Motors Corp.* (4th Cir. 1989) 883 F.2d 287, 291; *Walsh v. Ford Motor Co.* (D.C. Cir. 1986) 807 F.2d 1000, 1013-1015.) Therefore our conclusion that plaintiffs' express warranty claims under state law are preempted is fatal to any express warranty claim under Magnuson-Moss.

### Disposition
The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 2, 2002. George, C. J., and Chin, J., did not participate therein. *799

Cal.App.1.Dist.,2002.

SUSAN KANTER et al., Plaintiffs and Appellants, v. WARNER-LAMBERT COMPANY et al., Defendants and Respondents.

END OF DOCUMENT

Copr. © Bancroft-Whitney and West Group 1998

Exhibit B

Westlaw.

117 S.W.3d 488
117 S.W.3d 488
**(Cite as: 117 S.W.3d 488)**

➤

**Briefs and Other Related Documents**

Court of Appeals of Texas,
Beaumont.
WARNER-LAMBERT COMPANY, Pfizer, Inc.,
Bayer Corporation, Del Pharmaceuticals,
Inc., Del Laboratories, Inc., and Care Technologies,
Inc., Appellants,
v.
Katherine MILLS and Veronica Evans, Individually
and on Behalf of Others
Similarly Situated, Appellees.
No. 09-02-173 CV.

Submitted June 12, 2003.
Decided Sept. 11, 2003.

Consumers brought action against manufacturers under state law for breach of implied warranty and breach of implied warranty of merchantability, claiming that head lice products were not formulated to be effective for cure and treatment of head lice as advertised. Consumers brought motion to certify as class action, and the 163rd District Court, Orange County, Dennis Powell, J., granted the motion. Manufacturers filed interlocutory appeal. The Court of Appeals, David B. Gaultney, J., held that state law claims were preempted by federal law, and thus court did not have jurisdiction.

Order vacated; cause remanded.

Don Burgess, J., dissented with opinion.

West Headnotes

**[1] Appeal and Error** 🔑20
30k20 Most Cited Cases
Appellate court jurisdiction of the merits of a case extends no further than
that of the court from which the appeal is taken.

**[2] Appeal and Error** 🔑782
30k782 Most Cited Cases
If a trial court lacked jurisdiction, then an appellate court only has jurisdiction to set the judgment or order aside.

**[3] States** 🔑18.5
360k18.5 Most Cited Cases
If a state law comes into conflict with federal law, the state law is preempted and without effect. U.S.C.A. Const. Art. 6, cl. 2.

**[4] States** 🔑18.5
360k18.5 Most Cited Cases

**[4] States** 🔑18.7
360k18.7 Most Cited Cases
Federal law may preempt a state law impliedly, either when the scheme of federal regulation is sufficiently comprehensive to support a reasonable inference that Congress left no room for supplementary state regulation ("field preemption"), or if the state law actually conflicts with federal regulations ("conflict preemption"). U.S.C.A. Const. Art. 6, cl. 2.

**[5] States** 🔑18.5
360k18.5 Most Cited Cases
State law presents an actual conflict with federal law for preemption purposes when a party cannot comply with both state and federal regulations or when the state law would obstruct Congress' purposes and objectives. U.S.C.A. Const. Art. 6, cl. 2.

**[6] States** 🔑18.11
360k18.11 Most Cited Cases
The purpose of Congress is the ultimate touchstone in every preemption case. U.S.C.A. Const. Art. 6, cl. 2.

**[7] States** 🔑18.11
360k18.11 Most Cited Cases
Congressional intent to preempt state law may be discerned from the statute's language and structure, as well as other factors. U.S.C.A. Const. Art. 6, cl. 2.

**[8] States** 🔑18.11
360k18.11 Most Cited Cases
Purpose of a statute is revealed for preemption purposes through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law. U.S.C.A. Const. Art. 6, cl. 2.

**[9] States** 🔑18.5
360k18.5 Most Cited Cases
A state law action may impose a "requirement" under

117 S.W.3d 488
117 S.W.3d 488
**(Cite as: 117 S.W.3d 488)**

Page 2

state law, and therefore be preempted, when the state law requirement conflicts with a requirement imposed by federal law. U.S.C.A. Const. Art. 6, cl. 2.

**[10] Sales** ☞427
343k427 Most Cited Cases

**[10] States** ☞18.15
360k18.15 Most Cited Cases
Consumers' claims against head lice remedy manufacturers for breach of implied warranty and breach of implied warranty of merchantability under state law were preempted by Food and Drug Administration's (FDA's) specific requirements for active ingredients and labeling of pediculicide drug products, and thus trial court lacked jurisdiction to certify action as class action on those claims; crux of claim was that FDA-specified active ingredients in products were ineffective, and claim was not a products liability claim for purposes of federal statutory savings clause. U.S.C.A. Const. Art. 6, cl. 2; 21 U.S.C.A. §§ 332, 337(a), 379r; 21 C.F.R. § 330.10; V.T.C.A., Bus. & C. §§ 2.314, 17.50(a)(2).

*489 Jack Urquhart, Joseph S. Cohen and Robert B. Tobor, Beirne, Maynard & Parsons, LLP, Deborah A. Newman and Kathleen Hopkins Alsina, Phelps Dunbar, LLP, Richard Caldwell, Andrews & Kurth, LLP, Houston, Wayne Peveto, The Peveto Law Firm, Orange, David Klingsberg, Thomas A. Smart and Richard A. De Sevo, Kaye Scholer, LLP, New York, NY, for Appellees.

*490 Clay Dugas, Clay Dugas and Associates, PC, Beaumont, Pat Maloney, Jr., Law Offices of Pat Maloney, PC, San Antonio, Christa Brown, Austin, Troy" Trey" S. Martin III, and Christa Brown, Martin & Cukjati, LLP, San Antonio, for Appellees.

Before McKEITHEN, C.J., BURGESS and DAVID B. GAULTNEY, JJ.

**OPINION**

DAVID B. GAULTNEY, Justice.

This is an interlocutory appeal of an order certifying a class action. See Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(3) (Vernon Supp.2003). Appellants initially complain that the trial court lacked jurisdiction to enter the class certification order because federal law preempts appellees' state law causes of action. Appellants' contend that we have jurisdiction to entertain this issue, and that we must

first determine subject matter jurisdiction before we can address any other issue relating to the class certification.

[1][2] Appellate court jurisdiction of the merits of a case extends no further than that of the court from which the appeal is taken. Pearson v. State, 159 Tex. 66, 315 S.W.2d 935, 938 (1958). If the trial court lacked jurisdiction, then an appellate court only has jurisdiction to set the judgment or order aside. Dallas County Appraisal Dist. v. Funds Recovery, Inc., 887 S.W.2d 465, 468 (Tex.App.-Dallas 1994, writ denied); see also Fulton v. Finch, 162 Tex. 351, 346 S.W.2d 823, 827 (1961). The fact that the instant cause is before us under an otherwise limited right-of-appeal is of no import. As the Texas Supreme Court has observed, § 51.014(a)(3) of the Civil Practice and Remedies Code does not supplant the constitutional requirement that a reviewing court have subject matter jurisdiction. See McAllen Med. Center, Inc. v. Cortez, 66 S.W.3d 227, 231 (Tex.2001).

[3] Federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., art. VI, cl. 2. Where a state law comes into conflict with federal law, the state law is preempted and "without effect." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576, 595 (1981).

[4][5] Preemption may take one of several forms. A federal law may expressly preempt a state law. See Great Dane Trailers, Inc. v. Estate of Wells, 52 S.W.3d 737, 743 (Tex.2001). Federal law may also preempt a state law impliedly, either (1) when the scheme of federal regulation is sufficiently comprehensive to support a reasonable inference that Congress left no room for supplementary state regulation ("field preemption"), or (2) if the state law actually conflicts with federal regulations ("conflict preemption"). Id. State law presents an actual conflict when a party cannot comply with both state and federal regulations or when the state law would obstruct Congress' purposes and objectives. Id.

[6][7][8] "The purpose of Congress is the ultimate touchstone" in every preemption case. See Retail Clerks Int'l Ass'n v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). Congressional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.W.3d 488                                                                                    Page 3
117 S.W.3d 488
(Cite as: 117 S.W.3d 488)

intent may be discerned from the statute's language and structure, as well as other factors. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700, 716 (1996). The purpose of the statute is revealed through "the reviewing court's *491 reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.*

[9] This case concerns the Food, Drug, and Cosmetic Act, 21 U.S.C.A. § § 301-397 (1999) (FDCA or Act). The Act's preemption provision provides in part that no state "may establish or continue in effect" any "requirement" that "relates to the regulation" of an over-the-counter drug and that is "different from or in addition to, or that is otherwise not identical with, a requirement" under the FDCA. *See* 21 U.S.C.A. § 379r. A state law action may impose a "requirement" under state law, and therefore be preempted when the state law requirement conflicts with a requirement imposed by federal law. *See Worthy v. Collagen Corp.,* 967 S.W.2d 360, 370 (Tex.1998) (holding state law damage causes of action imposed "requirements" within the meaning of the Medical Devices Act preemption provision). Our preemption analysis looks at whether the state requirement sought to be imposed by this lawsuit is "different from or in addition to, or that is otherwise not identical with" a federal requirement under the Act. *See* 21 U.S.C.A. § 379r.

Our review of the lawsuit and the Act must be conducted within the context of the trial court's certification order, which limited the causes of action appellees were permitted to pursue. Those portions of the certification order are as follows:

The Court finds that the issues that will "occupy most of the efforts of the litigants and the court" are these: (1) Did the Defendants misrepresent their products through their advertising, promotion and marketing practices? (2) Were the Defendants' products fit for the ordinary purposes for which they were to be used? (3) Could the Defendants' products pass without objection in the trade under the contract description? (4) Did the Defendants' products conform to the promises or affirmations of fact made in their advertising and marketing? (5) What was the value of the Defendants' goods as accepted by Plaintiffs at the time and place of acceptance? These are marketing issues, not injury or causation issues. Because the Defendants' marketing practices were substantially the same across the country, the Court finds that the proof on these issues will be common as to all Plaintiffs.

Moreover, subsumed within all of the above issues is the even more fundamental question of whether or not the Defendants' products were formulated to be effective for the cure and treatment of head lice infestations. This is the more precise question on which most of the efforts at trial will focus. Through lay and expert testimony, anecdotal evidence, and documentary evidence, the court is convinced the parties will show whether the products were or were not properly formulated to cure head lice infestations, and whether or not the Defendants knew this when they were advertising and promoting the products.... Most importantly, this question of whether or not the Defendants' products conformed with the affirmations of fact made on their packages, labeling and advertising is a question that is exactly the same for all Plaintiffs in the class.
************
Causation regarding the breach of warranty claim can easily be determined as to all class members as a common issue, and will not run afoul of the requirement that causation be determined *492 as to individuals and not groups. The Plaintiffs will be required to prove that (1) the goods bought and sold were subject to an implied warranty of merchantability, (2) the goods were defective at the time of sale, (3) the defective nature of the goods caused plaintiffs' injuries, and (4) damages were suffered as a result. If the products the Defendants sold are found to be chemically and scientifically ineffective for the cure for Texas head lice infestations, then that will be a producing cause of the plaintiffs' economic loss regardless of what occurred after the consumer purchased the product. Either the product was properly formulated to be an effective cure for Texas head lice infestations at the time it left the Defendants' hands, or it was not. Thus, causation will not require individual proof, but can be determined on a class-wide basis.
************
Based on the foregoing, and on the evidence that has been presented to the court in support of certification, the court finds that the following causes of action should be certified in this action: 1) Breach of Implied Warranty under Tex. Bus. & Com.Code Ann. § 17.50(a)( [2] ); 2) Breach of Implied Warranty of Merchantability under Tex. Bus. & Comm. (sic) Code Ann. § 2.314.

The Act grants the Food and Drug Administration (FDA), as the designee of the Secretary of Health and Human Services (HHS), the authority to regulate, among other items, "drugs." *See* 21 U.S.C.A. § §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

321(g), 393. In *Kanter v. Warner-Lambert Company,* 99 Cal.App.4th 780, 122 Cal.Rptr.2d 72 (Cal.App.2002, review denied), a case also involving the efficacy of over-the-counter pediculicide [FN1] products, the court described in detail the exhaustive process by which the FDA decides whether a drug is ultimately approved for marketing as "safe and effective." The *Kanter* court detailed the pre-market approval process mandated by the FDA as including the following:

> FN1. "Pediculicide drug product. A drug product for the treatment of head, pubic (crab), and body lice." 21 C.F.R. § 358.603.

A manufacturer seeking approval of a new drug must submit a detailed new drug application in accordance with the requirements of the FDCA and related regulations promulgated by the FDA. (§ 355(b)(1); 21 C.F.R. §§ 314.1-314.3, 314.50 (2001).) Among other information, a new drug application must include "substantial evidence" that the drug is safe and effective, meaning "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." (§ 355(d); see 21 C.F.R. § 314.26 (2001) [explaining characteristics of "adequate and well-controlled study"].)

A new drug application must also include "specimens" of the labeling proposed for the drug. (§ 355(b)(1)(F); see 21 C.F.R. §§ 314.50(c)(2)(i) (2001) [application must include proposed text of labeling], 201 et seq. (2001) [general labeling provisions].) If the FDA determines that the labeling of a new drug is false or misleading in any particular, the drug is deemed "misbranded." Whether labeling *493 is false or misleading depends not only on its stated or suggested representations, but also on the extent to which it fails to reveal any material facts. (§§ 352(a), 321(n).) The application will be refused if the FDA determines that the labeling is false or misleading in any particular, if the application contains an untrue statement of a material fact, or if the proposed labeling does not comply with the requirements established in the regulations. (§

355(d)(7); 21 C.F.R. § 314.125(b)(6), (7), (8) (2001).)
*Kanter,* 122 Cal.Rptr.2d at 76-77.

The FDA may withdraw approval of a drug, after notice and a hearing, "on the basis of new information before [the Secretary of Health and Human Services] with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof[.]" *See* 21 U.S.C.A. § 355(e)(3); 21 C.F.R. § 12.1 et seq. Subchapter III of the Act contains extensive policing provisions available to the FDA, includes a list of prohibited acts with accompanying civil and criminal penalties applicable to both individual and corporate violators, and provides for injunctive relief. *See* 21 U.S.C.A. § § 331-337. The Act limits injunctive proceedings to "district courts of the United States and United States courts of the Territories," and provides "all" other proceedings "for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." *See* 21 U.S.C.A. § 332, 337(a).

FDA regulations specify the active ingredients required to be included in a nonprescription pediculicide drug product in order for the product to be recognized as effective. *See* 21 C.F.F. § § 330.10 & 358.601, 358.610 (2003). The regulations also specify labeling requirements. 21 C.F.R. § 358.650 (2003). In examining the certification order, and the pleadings at trial and the arguments on appeal, we see no claim that the formula of the products in question ("NIX," "RID," "PRONTO," and "CLEAR LICE"), which was approved by the FDA as "safe and effective" for sale to the general public, was tampered with, changed, re-constituted, or adulterated by appellants. Appellees' lone contention is that the formula, as approved by the FDA, simply does not kill lice. Appellees do not contest the fact that the products in question do indeed comply with the FDA-approved formula for nonprescription pediculicide drug products, and that the products were marketed in compliance with the appropriate approval process mandated by the FDA. *See* 21 C.F.R. § 330.10.

As the trial court detailed in its certification order, the issue in this case is not merely whether appellants' products "work or not," but how the products in question were "formulated." This case does not

117 S.W.3d 488
117 S.W.3d 488
(Cite as: 117 S.W.3d 488)

involve a manufacturing defect, or a claim that some batch of the pediculicides in question did not conform to the FDA regulations; the crux of the claim is that the FDA-specified active ingredients are ineffective. The trial court's certification order would permit "lay and expert testimony, anecdotal evidence, and documentary evidence" as proof that "the products were or were not properly formulated" as an effective treatment for head lice infestation. An additional issue to be litigated would be whether or not appellants knew of any alleged ineffectiveness of their products "when they were advertising and promoting the products." Appellees would attempt to prove that appellants' products were "chemically and scientifically ineffective *494 for the cure of Texas head-lice infestations." It appears appellees would attempt to prove the FDA regulation--which specifies the active ingredients that must be included if the product is to be considered effective--is simply incorrect, and that appellants' products should not contain the active ingredients specified by the FDA if they are to be marketed in Texas as a treatment for head-lice infestation. In practical effect, the state lawsuit would make unlawful the sale of a product formulated to comply with a federal requirement. This litigation would impose a state requirement that is "different from or in addition to, or that is otherwise not identical with," a requirement under the Act. See 21 U.S.C.A. § 379r; see generally Worthy, 967 S.W.2d at 370 (state lawsuits may be "requirements" preempted by federal law).

[10] We conclude appellees' claims, as certified by the trial court, conflict with the FDA's specific requirements for active ingredients and labeling of pediculicide drug products. [FN2] What appellees refer to as the "statutory savings clause," 21 U.S.C.A. § 379r(e), which explicitly exempts state "products liability" causes of action from the otherwise preemptive provisions of § 379r, does not aid appellees' position. That Congress included specific exemption language within § 379r suggests Congress' intent to preempt all other statutory or common-law state causes of action. Furthermore, the products liability exception is not available to appellees in the instant litigation, as appellees have expressly disavowed any personal injury or other physical impairment from the use of appellants' products and they are not claiming the product damaged some other property. Tex. Civ. Prac. & Rem Code Ann. § 82.001(2) (Vernon 1997), defines "products liability action" as any action against a manufacturer or seller for recovery of damages arising out of "personal injury, death, or property damage" allegedly caused by a defective product. No

product liability cause of action has been certified by the trial court in the instant litigation.

> FN2. What is not before us and we are not deciding is any claim or allegation that a particular nonprescription pediculicide does not contain the FDA-approved active ingredients: "the combination of pyrethrum extract (providing a concentration of pyrethrins of 0.17 to 0.33 percent) with piperonyl butoxide (2 to 4 percent) in a nonaerosol dosage formulation." See 21 C.F.R. § 358.610.

We hold that the scope of the causes of action to be litigated, as contained in the trial court's order certifying the class action, are preempted by federal law. The trial court was without subject matter jurisdiction to certify these claims as a class action lawsuit. Appellants' first appellate issue is sustained. The certification order is vacated, and the case is remanded for further proceedings consistent with this opinion.

TRIAL COURT'S CERTIFICATION ORDER VACATED; CAUSE REMANDED.

DON BURGESS, Justice, dissenting.

I respectfully dissent. The majority holds this action is preempted by the FDA regulations; I disagree. The majority states: "In practical effect, the state lawsuit would make unlawful the sale of a product formulated to comply with a federal requirement." The state lawsuit does not seek to prohibit the sale of the product, quite the contrary, it only seeks to afford the plaintiffs a remedy not afforded under the FDA scheme-restitution of the amounts paid for the products. I would *495 overrule appellants' first issue and consider the interlocutory appeal on its merits.

117 S.W.3d 488

**Briefs and Other Related Documents** (Back to top)

- 09-02-00173-CV                (Docket) (Apr. 30, 2002)

END OF DOCUMENT

Westlaw.

157 S.W.3d 424                                                          Page 1
157 S.W.3d 424, 48 Tex. Sup. Ct. J. 405
**(Cite as: 157 S.W.3d 424)**

**H**

**Briefs and Other Related Documents**

Supreme Court of Texas.
Katherine MILLS, et al., Petitioners,
v.
WARNER LAMBERT CO., et al., Respondents.
**No. 03-1052.**

Feb. 11, 2005.

**Background:** Consumers brought action against pharmaceutical companies under state law for breach of implied warranty and breach of implied warranty of merchantability, claiming that over-the-counter head lice products were not formulated to be effective for cure and treatment of head lice as advertised. The 163rd District Court, Orange County, Dennis Powell, J., granted consumers' motion to strike defendants' federal preemption defense and granted consumers' motion for class certification. Defendants filed interlocutory appeal. The Beaumont Court of Appeals, 117 S.W.3d 488, vacated and remanded. Review was granted.

**Holding:** The Supreme Court held that even if federal Food, Drug, and Cosmetic Act (FDCA) preempted state-law claims, the FDCA did not deprive the state court of subject matter jurisdiction. Court of Appeals reversed; remanded.

West Headnotes

**[1] States** ⟨key⟩**18.5**
360k18.5 Most Cited Cases
If a state law conflicts with federal law, it is preempted under the Supremacy Clause, and has no effect. U.S.C.A. Const. Art. 6, cl. 2.

**[2] States** ⟨key⟩**18.3**
360k18.3 Most Cited Cases
There are three ways that a state law may conflict with federal law and thus be preempted under the Supremacy Clause: (1) federal law may expressly preempt state law; (2) federal law or regulations may impliedly preempt state law or regulations if the federal statute's scope indicates that Congress intended federal law or regulations to occupy the field exclusively; and (3) state law is impliedly

preempted if it actually conflicts with federal law or regulations, because (a) it is impossible for a private party to comply with both state and federal requirements, or (b) state law obstructs accomplishing and executing Congress' full purposes and objectives. U.S.C.A. Const. Art. 6, cl. 2.

**[3] Courts** ⟨key⟩**489(1)**
106k489(1) Most Cited Cases
Federal preemption is ordinarily a federal defense to the plaintiff's suit, but it does not ordinarily deprive a state court of subject matter jurisdiction. U.S.C.A. Const. Art. 6, cl. 2.

**[4] Courts** ⟨key⟩**489(1)**
106k489(1) Most Cited Cases
The lack of explicit forum-preempting language is not controlling as to whether a state court has concurrent jurisdiction to hear an action in which federal law preempts state-law claims, where there is other evidence that Congress intended to establish an exclusive federal forum; presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests. U.S.C.A. Const. Art. 6, cl. 2.

**[5] Courts** ⟨key⟩**489(1)**
106k489(1) Most Cited Cases
Even if consumers' state-law claims against pharmaceutical companies for breach of implied warranty with respect to over-the-counter head lice products were preempted by federal Food, Drug, and Cosmetic Act (FDCA), state courts were not divested of subject matter jurisdiction over the action; there was no explicit forum-preempting language in FDCA, the FDCA did not contain complex and interrelated federal scheme of law, remedy, and administration, and there was no indication in legislative history of FDCA that Congress intended it to divest state courts of jurisdiction to hear claims relating to nonprescription drugs or that state-court jurisdiction would be incompatible with federal interests. U.S.C.A. Const. Art. 6, cl. 2; Federal Food, Drug, and Cosmetic Act, § 751(e), as amended, 21 U.S.C.A. § 379r(e).

**\*425** Troy S. Martin III, Curtis L. Cukjati, Martin & Cukjati, San Antonio, Christa Brown, Austin, for petitioners.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

157 S.W.3d 424
157 S.W.3d 424, 48 Tex. Sup. Ct. J. 405
**(Cite as: 157 S.W.3d 424)**

Deborah A. Newman, Forman, Perry, Watkins, Krutz & Tardy, LLP, Houston, for respondent Bayer Corporation.

Richard H. Caldwell, Andrews & Kurth LLP, Houston, for respondents Del Pharmaceutical, Inc., and Del Laboratories.

M.C. Carrington, Mehaffy & Weber, Beaumont, for respondent Care Technologies, Inc.

Jack E. Urquhart, Joseph S. Cohen, N. Terry Adams, Beirne Maynard & Parsons, L.L.P., Houston, Richard A. Desevo, David Klingsberg, Thomas A. Smart, Kaye Scholer LLP, New York, NY, Wayne Peveto, The Peveto Law Firm, Orange, for respondents Warner-Lambert Company and Pfizer Inc.

PER CURIAM.

This case involves an interlocutory appeal of a class-certification order. The primary issue is whether the portions of the Federal Food, Drug, and Cosmetic Act (FDCA) regulating nonprescription drugs deprived the trial court of subject matter jurisdiction to hear claims regarding the efficacy of certain head-lice remedies. The court of appeals concluded that the FDCA preempted the class's state-law claims and deprived the trial court of jurisdiction to enter its class-certification order. We disagree with the court of appeals' conclusion that the trial court lacked subject matter jurisdiction. Ordinary preemption operates as an affirmative defense to a plaintiff's state-law claims but does not deprive state courts of jurisdiction over those claims. State-court jurisdiction is affected only when Congress requires that claims be addressed exclusively in a federal forum. *See San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 242-45, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

In this case, we conclude that the FDCA provision at issue is not one of the few statutes that require claims to be resolved exclusively in a federal forum. The relevant section of the FDCA contains no forum-preempting language and indicates no intent to vest exclusive jurisdiction in a federal forum. We therefore conclude that the FDCA did not deprive the trial court of subject matter jurisdiction. Because this is an interlocutory appeal, only the question of subject matter jurisdiction is before us at this time; consequently, we do not decide whether the FDCA would, through ordinary preemption, provide a full defense to the plaintiffs' claims. We reverse the court of appeals' judgment and remand the case to that

court for consideration of the other issues raised on appeal. *See* Tex.R.App. P. 59.1.

The petitioners in this case are plaintiffs suing six pharmaceutical companies for breach of the implied warranty of merchantability of certain over-the-counter head-lice remedies. The plaintiffs argue that, as lice strains have developed resistance to the active ingredient in the companies' products, those products are no longer capable of effectively treating head-lice infestations and are therefore unfit for their ordinary purpose. *See* Tex. Bus. & Com.Code § 2.314(b)(3). The plaintiffs sought breach-of-warranty damages under *426 the Deceptive Trade Practices Act. *See* Tex. Bus. & Com.Code § § 17.46(b), 17.50(a)(1). The defendants moved for summary judgment in the trial court, arguing that the FDCA preempted the plaintiffs' claims. The plaintiffs filed a cross-motion, asking the trial court to rule as a matter of law that the claims were not preempted. The court granted the plaintiffs' motion and struck the defendants' affirmative defense of federal preemption. The trial court subsequently certified a class of Texas consumers and adopted a trial plan. The pharmaceutical companies then brought this interlocutory appeal challenging the class-certification order. *See* Tex. Civ. Prac. & Rem.Code § 51.014(3).

Before examining whether the trial court's certification order complied with Texas Rule of Civil Procedure 42, the court of appeals first considered whether the trial court had jurisdiction to enter the certification order at all. 117 S.W.3d 488, 490; *see McAllen Med. Ctr., Inc. v. Cortez,* 66 S.W.3d 227, 231 (Tex.2001) (stating that "the interlocutory appeal statute does not supplant the constitutional requirement that the court of appeals have subject-matter jurisdiction"); *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 938 (1958) ("[T]he jurisdiction of the appellate court as to the merits of a case extends no further than that of the court from which the appeal is taken.").

The court of appeals concluded that federal law preempted the plaintiffs' claims and deprived the trial court of subject matter jurisdiction. 117 S.W.3d at 494. The court noted that the FDCA provides that no state "may establish or continue in effect" any "requirement" that "relates to the regulation" of an over-the-counter drug and that is "different from or in addition to, or that is otherwise not identical with, a requirement" under the FDCA. *Id.* at 493 (quoting 21 U.S.C. § 379r). The court also noted that "[a]ppellees do not contest the fact that the products

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

157 S.W.3d 424
157 S.W.3d 424, 48 Tex. Sup. Ct. J. 405
**(Cite as: 157 S.W.3d 424)**

in question do indeed comply with the FDA-approved formula for nonprescription [head-lice remedies], and that the products were marketed in compliance with the appropriate approval process mandated by the FDA." *Id.* The court concluded that because "[i]n practical effect, the state lawsuit would make unlawful the sale of a product formulated to comply with a federal requirement," the lawsuit would impose a state requirement "different from or in addition to" a requirement under the Act. *Id.* at 494. After the court concluded that the lawsuit was preempted under federal law, it then concluded, without further analysis, that the preemption deprived the trial court of subject matter jurisdiction. *Id.* We disagree.

[1][2] Under the Supremacy Clause of the United States Constitution, the laws of the United States are "the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. If a state law conflicts with federal law, it is preempted and has no effect. *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Am. Cyanamid Co. v. Geye,* 79 S.W.3d 21, 23 (Tex.2002). There are three ways that a state law may conflict with federal law and thus be preempted. *See Great Dane Trailers, Inc. v. Estate of Wells,* 52 S.W.3d 737, 743 (Tex.2001). First, "[a] federal law may expressly preempt state law." *Id.* (citing *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). Second, "federal law or regulations may impliedly preempt state law or regulations if the statute's scope indicates that Congress intended federal law or regulations to occupy the field exclusively." *Id.* (citing **\*427** *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)). Finally, state law is also impliedly preempted if it "actually conflicts with federal law or regulations," because "(1) it is impossible for a private party to comply with both state and federal requirements; or (2) state law obstructs accomplishing and executing Congress' full purposes and objectives." *Id.* In this case, defendants assert that the FDCA fits into the first category of express preemption as it expressly provides that no state "may establish or continue in effect" "any requirement" that "relates to the regulation" of an over-the-counter drug and that is "different from or in addition to, or that is otherwise not identical with, a requirement" under the FDCA. 21 U.S.C. § 379r.

[3] Even if the defendants are correct that the FDCA preempts this state-law claim, however, it does not

mean that the trial court lacked jurisdiction over the claim. Federal preemption "is ordinarily a federal defense to the plaintiff's suit" but does not ordinarily deprive a state court of jurisdiction. *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). As a result, "[t]here are thus some cases in which a state law cause of action is preempted, but only a state court has jurisdiction to so rule." *Romney v. Lin,* 105 F.3d 806, 813 (2d Cir.1997) (denying rehearing). Consequently, we disagree with the court of appeals' conclusion that federal preemption, without more, would necessarily deprive the trial court of jurisdiction.

In support of their argument that preemption divests state courts of jurisdiction, the respondents cite several cases holding that federal law may "pre-empt conflicting state-court jurisdiction." *Int'l Longshoremen's Assoc. v. Davis,* 476 U.S. 380, 388, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986); *see also Gorman v. Life Ins. Co. of N. Am.,* 811 S.W.2d 542, 547 (Tex.1991). When the courts in these cases spoke of "preemption of jurisdiction," however, they were not referring to the applicability of federal law; rather, they referred to Congress's ability to require resolution of certain claims exclusively in a federal forum. *See Chappell v. SCA Servs., Inc.,* 540 F.Supp. 1087, 1095 (D.Ill.1982) (suggesting that "[f]ederal preemption ... should be distinguished from exclusive federal jurisdiction," because "[i]n the former, federal substantive law supplants state law but absent other provisions both state and federal courts have concurrent jurisdiction of actions arising under that law; in the latter, only the specified federal instrumentalities have jurisdiction of the matter, irrespective of the law to be applied.") (quoting 1A Moore's Federal Practice, & 0.160 at 189 (2d ed.1981)). Thus, in *Davis,* the United States Supreme Court held that the National Labor Relations Board had exclusive jurisdiction to hear certain labor claims, and that neither state courts nor federal courts had jurisdiction to hear a claim "which could have been, but was not, presented to the Labor Board." *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 197, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); *Davis,* 476 U.S. at 393, 106 S.Ct. 1904. Similarly, this Court held in *Gorman* that state courts had no jurisdiction over certain ERISA claims. *Gorman,* 811 S.W.2d at 547-49; *see also Southland Life Ins. Co. v. Estate of Small,* 806 S.W.2d 800, 801 (Tex.1991). Again, however, this decision rested on the creation of an exclusive federal forum rather than the existence of a preemption defense; Section 502 of ERISA provides that, with the exception of certain exempted actions,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

157 S.W.3d 424
157 S.W.3d 424, 48 Tex. Sup. Ct. J. 405
**(Cite as: 157 S.W.3d 424)**

Page 4

"the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter...." 29 U.S.C. § 1132(e)(1). The FDCA, by contrast, **\*428** does not contain any express forum-preemption language. *See* 21 U.S.C. § 379r.

[4] The lack of explicit forum-preempting language is not controlling when there is other evidence that Congress intended to establish an exclusive federal forum; "the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." *Tafflin v. Levitt,* 493 U.S. 455, 459-60, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990); *see also Davis,* 476 U.S. at 388, 106 S.Ct. 1904 ("It is clearly within Congress' powers to establish an exclusive federal forum to adjudicate issues of federal law in a particular area that Congress has the authority to regulate under the Constitution. Whether it has done so in a specific case is the question that must be answered when a party claims that a state court's jurisdiction is pre-empted.") (citation omitted). For example, Congress demonstrated such intent in the National Labor Relations Act, where "Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules.... A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." *Garmon,* 359 U.S. at 242-44, 79 S.Ct. 773 (citation omitted). In *Garmon,* the United States Supreme Court held that because Congress had enacted such a "complex and interrelated federal scheme of law, remedy, and administration" in the NLRA, "due regard for the federal enactment requires that state jurisdiction must yield." *Id.* at 243-44, 79 S.Ct. 773 (citation omitted).

[5] In this case, we conclude that the FDCA contains no such "complex and interrelated federal scheme of law, remedy, and administration" that would divest the state courts of jurisdiction. *Id.* The statute neither includes a private civil enforcement provision nor specifies a forum where claims may be heard. 21 U.S.C. § 379r. Nor is there indication in the legislative history of the FDCA that Congress intended it to divest state courts of jurisdiction to hear claims relating to nonprescription drugs, or that state-court jurisdiction would be incompatible with federal interests. The Act itself provides that "[n]othing in this section shall be construed to modify or otherwise affect any action or the liability of any person under

the product liability law of any State." 21 U.S.C. § 379r(e). The Senate Committee Report for the bill enacting that provision similarly noted that "the legislation explicitly provides that it shall not be construed to modify or otherwise affect the traditional product liability law of any State. Tort liability rules and requirements would remain unchanged and unaffected." S.Rep. No. 105-43, at 66 (1997). Congress's decision to exclude such a broad category of claims from the reach of the statute is inconsistent with an intent to vest "exclusive jurisdiction ... in another body." *Davis,* 476 U.S. at 388, 106 S.Ct. 1904.

We therefore conclude that the FDCA does not deprive state courts of subject matter jurisdiction to hear claims relating to such products. We do not decide whether the FDCA would, through ordinary preemption, provide a full defense to the plaintiffs' claims; in this interlocutory appeal, only the question of subject matter jurisdiction is currently before us.

Pursuant to Rule 59.1 of the Texas Rules of Appellate Procedure, we grant the class's Petition for Review, and, without oral argument, we reverse the court of appeals' judgment and remand the case to that court for consideration of the other **\*429** issues raised on appeal. *See* Tex.R.App. P. 59.1.

157 S.W.3d 424, 48 Tex. Sup. Ct. J. 405

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 1237312 (Appellate Brief) Petitioners' Reply Brief on the Merits (May. 20, 2004)Original Image of this Document (PDF)

• 2004 WL 936834 (Appellate Brief) Brief on the Merits of Respondents Pfizer Inc., Del Pharmaceuticals, Inc., Del Laboratories, Inc. and Care Technologies, Inc. (Apr. 19, 2004)Original Image of this Document (PDF)

• 2004 WL 936835 (Appellate Brief) Brief on the Merits of Respondents Warner-Lambert Company LLC and Bayer Corporation (Apr. 19, 2004)Original Image of this Document (PDF)

• 2004 WL 768960 (Appellate Brief) Peititoners' Brief on the Merits (Mar. 26, 2004)Original Image of this Document (PDF)

•                        03-1052                    (Docket) (Nov. 17, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

157 S.W.3d 424
157 S.W.3d 424, 48 Tex. Sup. Ct. J. 405
**(Cite as: 157 S.W.3d 424)**

Page 5

• 2003 WL 23198617 (Appellate Petition, Motion and Filing) Petition for Review (Nov. 2003)Original Image of this Document (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

SEVENTEENTH EDITION

# THE MERCK MANUAL

OF

## DIAGNOSIS AND THERAPY

MARK H. BEERS, M.D., and ROBERT BERKOW, M.D.

*Editors*

*Senior Assistant Editors*
ROBERT M. BOGIN, M.D., and
ANDREW J. FLETCHER, M.B., B.Chir.

*Editorial Board*
Philip K. Bondy, M.D.
Preston V. Dilts, Jr., M.D.
Douglas A. Drossman, M.D.
L. Jack Faling, M.D.
Eugene P. Frenkel, M.D.
Glen O. Gabbard, M.D.
Robert A. Hoeckelman, M.D.
Gerald L. Mandell, M.D.
Fred Plum, M.D.
G. Victor Rossi, Ph.D.
Paul H. Tanser, M.D., F.R.C.P.(C)

*Published by* MERCK RESEARCH LABORATORIES
*Division of* MERCK & CO., INC.
Whitehouse Station, N.J.

1999

## FOREIGN LANGUAGE EDITIONS
of *The Merck Manual*

Arabic—Larike Publications Services, Cyprus
Chinese—People's Medical Publishing House, Beijing
Czech—Egem, Prague
French—Éditions d'Apres, Paris
German—Urban & Schwarzenberg, GmbH, Munich
Greek—Medical & Scientific Publishing, Athens
Hungarian—Melania, Budapest
Italian—Stampa Medica, s.p.a, Rome
Japanese—Medical Book Service Ltd., Naka-Ku Nagoya
Polish—Urban & Partner, Wroclaw
Portuguese—Editora Roca, Ltda, São Paulo
Russian—MIR Publishers, Moscow
Spanish—Harcourt Brace, Barcelona
Turkish—Yüce, Istanbul

## OTHER MERCK BOOKS

THE MERCK INDEX
*First Edition, 1889*

THE MERCK VETERINARY MANUAL
*First Edition, 1955*

THE MERCK MANUAL OF GERIATRICS
*First Edition, 1990*

THE MERCK MANUAL OF MEDICAL INFORMATION—HOME EDITION
*First Edition, 1997*

Merck books are published on a nonprofit basis as a service to the scientific community and the public.

# FOREWORD

With this edition, *The Merck Manual* celebrates its 100th birthday. When the editors of the 1st Edition produced their 192-page compendium, they could not have realized the extent to which medical knowledge would explode over the next century. *The Merck Manual* now fills 2,655 pages and covers countless diseases that were not known 100 years ago. A brief review of medical practice as reflected in *The Merck Manual* during the past century follows on page vii.

Although the knowledge of medicine has grown, the goal of *The Merck Manual* has not changed—To provide useful clinical information to practicing physicians, medical students, interns, residents, nurses, pharmacists, and other health care professionals in a concise, complete, and accurate manner. *The Merck Manual* continues to cover all the subjects expected in a textbook of internal medicine as well as detailed information on pediatrics, psychiatry, obstetrics, gynecology, dermatology, pharmacology, ophthalmology, otolaryngology, and a number of special subjects. *The Merck Manual* quickly provides information that helps practitioners achieve optimal care. The more specialized the practice of medicine becomes, the more important such information becomes. Specialists as well as generalists must at some time quickly access information about other specialties.

The 17th edition of *The Merck Manual* is the culmination of an arduous but rewarding 7-year enterprise. Every topic has been updated, and many have been completely rewritten. Topics new to this edition include hand disorders, prion diseases, death and dying, probabilities in clinical medicine, multiple chemical sensitivity, chronic fatigue syndrome, rehabilitation, smoking cessation, and drug therapy in the elderly, among others. The members of the Editorial Board, special consultants, and contributing authors are listed on the following pages with their affiliations. They deserve a degree of gratitude that cannot be adequately expressed here, but we know they will feel sufficiently rewarded if their efforts serve your needs.

Because of the extensive subject matter covered and a successful tradition developed through trials of successes and failures, *The Merck Manual* has some unique characteristics. We urge readers to spend a few minutes reviewing the Guide for Readers (p. xii), the Table of Contents at the beginning of each section (indicated by a thumb tab), and the Index (p. 2657). Subject headings within each section, internal headings within a subject discussion, and boldfaced terms in the text form an outline intended to help with use of the text.

We hope this edition of *The Merck Manual* will serve as an aid to you, our readers, compatible with your needs and worthy of frequent use. Suggestions for improvements will be warmly welcomed and carefully considered.

MARK H. BEERS, M.D., and ROBERT BERKOW, M.D., *Editors*

## Editorial and Production Staff

*Executive Editor:*  Keryn A.G. Lane

*Senior Staff Editor:*  Susan T. Schindler
*Staff Editor:*  Julie Kostecky
*Staff Editor:*  Sandra J. Masse
*Production Editor:*  Debra G. Share
*Contributing Editor:*  Roger I. Schreck, M.D.

*Designer:*  Lorraine B. Kilmer
*Indexer:*  Susan Thomas, Ph.D.
*Textbook Production Coordinator:*  Diane C. Zenker
*Medical Textbook Coordinator:*  Dorothy A. Bailey
*Executive Assistant:*  Diane Cosner-Bobrin

*Publisher:*  Gary Zelko
*Advertising and Promotional Supervisor:*  Pamela J. Barnes

Library of Congress Catalog Card Number 1–31760
ISBN 0911910-10-7
ISSN 0076–6526

Copyright © 1999 by Merck & Co., Inc.

All rights reserved. No part of this book may be reproduced or used in any form or by any means, electronic or mechanical, including photocopying, or ing from information storage and retrieval system, without permission in writing from the Publisher. Inquiries should be addressed to The Merck Manuals Department, P.O. Box 4, Merck & Co., West Point, PA 19486.

Printed in the U.S.A.

SECTION 6

# PULMONARY DISORDERS

63 / APPROACH TO THE PULMONARY PATIENT ............ 511
    Cough ...................................................... 511
    Dyspnea ................................................... 514
    Chest Pain ................................................ 516
    Wheeze .................................................... 517
    Stridor .................................................... 517
    Hemoptysis ................................................ 520
    Cyanosis .................................................. 520
    Finger Clubbing ........................................... 521

64 / PULMONARY FUNCTION TESTING ..................... 521

65 / SPECIAL PROCEDURES .............................. 532
    Chest Imaging ............................................. 532
    Thoracentesis ............................................. 533
    Percutaneous Needle Biopsy of Pleura ...................... 534
    Thoracoscopy .............................................. 534
    Tube Thoracostomy ......................................... 535
    Bronchoscopy .............................................. 535
    Percutaneous Transthoracic Needle Aspiration .............. 538
    Mediastinoscopy ........................................... 538
    Mediastinotomy ............................................ 538
    Thoracotomy ............................................... 539
    Tracheal Aspiration ....................................... 540
    Airway Establishment and Control .......................... 543
    Postural Drainage ......................................... 543
    Pulmonary Rehabilitation .................................. 544
    Pursed-Lip Breathing ...................................... 544

66 / RESPIRATORY FAILURE ............................. 551

67 / ADULT RESPIRATORY DISTRESS SYNDROME ............. 555

68 / CHRONIC OBSTRUCTIVE AIRWAY DISORDERS ........... 556
    Asthma .................................................... 556
    Chronic Obstructive Pulmonary Disease ..................... 568
    Giant Bullae .............................................. 582

69 / ACUTE BRONCHITIS ................................ 582

70 / BRONCHIECTASIS .................................. 584

71 / ATELECTASIS ..................................... 590

72 / PULMONARY EMBOLISM .............................. 593

73 / PNEUMONIA ....................................... 601
    Pneumococcal Pneumonia .................................... 602
    Staphylococcal Pneumonia .................................. 605
    Streptococcal Pneumonia ................................... 606
    Pneumonia Caused by Gram-Negative Bacilli ................. 606

**73 / PNEUMONIA** *(continued)*
Pneumonia Caused by *Haemophilus influenzae* ......607
Pneumonia of Legionnaires' Disease ......608
Mycoplasmal Pneumonia ......609
Chlamydial Pneumonia ......610
Psittacosis ......611
Viral Pneumonia ......611
Pneumonia Caused by *Pneumocystis carinii* ......612
Fungal Pneumonia ......613
Pneumonia in the Compromised Host ......613
Postoperative and Posttraumatic Pneumonia ......615
Aspiration Pneumonia ......615

**74 / LUNG ABSCESS** ......616

**75 / OCCUPATIONAL LUNG DISEASES** ......619
Diseases Due to Inorganic Dusts ......620
Silicosis ......620
Coal Workers' Pneumoconiosis ......622
Asbestosis and Related Disorders ......622
Berylliosis ......624
Diseases Due to Organic Dusts ......625
Occupational Asthma ......625
Byssinosis ......625
Diseases Due to Irritant Gases and Other Chemicals ......626
Sick Building Syndrome ......626

**76 / HYPERSENSITIVITY DISEASES OF THE LUNGS** ......627
Hypersensitivity Pneumonitis ......628
Eosinophilic Pneumonias ......631
Allergic Bronchopulmonary Aspergillosis ......633

**77 / GOODPASTURE'S SYNDROME** ......634

**78 / IDIOPATHIC INTERSTITIAL LUNG DISEASES** ......635
Idiopathic Pulmonary Fibrosis ......635
Desquamative Interstitial Pneumonia ......637
Acute Interstitial Pneumonia ......637
Respiratory Bronchiolitis–Associated Interstitial Lung Disease ......637
Idiopathic Bronchiolitis Obliterans With Organizing Pneumonia ......638
Lymphocytic Interstitial Pneumonitis ......638
Langerhans' Cell Granulomatosis ......639
Eosinophilic Granuloma ......640
Idiopathic Pulmonary Hemosiderosis ......640

**79 / PULMONARY ALVEOLAR PROTEINOSIS** ......641

**80 / PLEURAL DISORDERS** ......642
Pleurisy ......642
Pleural Effusion ......642
Pleural Fibrosis and Calcification ......643
Pneumothorax ......648

**81 / TUMORS OF THE LUNG** ......651
Bronchogenic Carcinoma ......651

# 63 / APPROACH TO THE PULMONARY PATIENT

Diagnosis and management of pulmonary disorders requires a history, a physical examination, and usually chest x-rays. Pulmonary function testing, arterial blood gas analysis, chemical or microbiologic tests, or special studies (eg, endoscopy, bronchoalveolar lavage, biopsy, radionuclide scanning) may be needed. These special tests and techniques are discussed elsewhere in THE MANUAL.

History-taking provides essential information and initiates understanding of the patient as a person and of the patient's environment, expectations, and fears; it is the best way to develop rapport and collaboration. Data desired include those relating to occupational or other exposures; family, travel, and contact history; an account of previous illnesses and use of drugs; and test results (eg, from tuberculin skin tests or chest x-rays). Most important, however, are a clear definition of the present complaint, several symptoms (eg, lassitude, weight loss, fever), and the major respiratory symptoms of cough, sputum, dyspnea, chest pain, wheeze, and hemoptysis. A parent or guardian can speak for an infant or young child; if an elderly person is demented, additional information should be sought from relatives or associates.

Physical examination follows history-taking in importance. Some instruments (general condition, demeanor, discomfort, anxiety, dyspnea on exertion) is absorbed almost subconsciously as the patient walks from the waiting room to the office, whereas other general and respiratory information must be actively sought. The sequence of inspection, palpation, percussion, and auscultation should be followed when examining the lungs. In some patients, the chest examination may yield no information even when a serious disease is present; in others, it yields a pearl (eg, incoordination of respiratory muscle groups, a pleural friction rub, or a localized monophonic wheeze).

## COUGH

*A sudden explosive expiratory maneuver that tends to clear material (sputum) from the airways.*

Coughing helps protect the lungs against aspiration. Differences among several sites from which cough stimuli can originate may result in variations in the sounds and patterns of coughing. Laryngeal stimulation produces a choking type of cough without a preceding inspiration. Inadequate mucociliary clearance mechanisms (as in bronchiectasis or cystic fibrosis) may produce a pattern of coughing with less violent acceleration of air and a sequence of interrupted expirations without any intervening inspiration. Awareness of cough varies considerably. A cough can be distressing when it appears suddenly, especially if associated with discomfort due to chest pain, dyspnea, or copious secretions. A cough that develops over decades (eg, in a smoker with mild chronic bronchitis) may be hardly noticeable or may be considered normal by the patient.

Questions should determine how long a cough has been present, whether it began suddenly, if it has changed recently, what factors influence it (eg, cold air, talking, posture, eating or drinking, time of day), and whether it is associated with sputum production, chest or retrosternal or throat pain, dyspnea, hoarseness, dizziness, or other symptoms. The patient should be asked what he thinks causes it; he may say "something in my lungs that needs to be coughed up" or "something tickling the back of my throat." Patterns of coughing or precipitating factors may be a clue to its cause; eg, the patient may have noted an association with sleep or exercise. A cough induced by postural change may suggest chronic lung abscess, cavitary TB, bronchiectasis, or a pedunculated tumor, whereas a cough associated with eating suggests a disturbance of the swallowing mechanism or possibly a tracheoesophageal fistula. A cough that appears on exposure to cold air or during exercise may suggest asthma. A morning cough persisting until sputum is expectorated typifies chronic bronchitis. A cough that is associated with rhinitis or wheezing or that is seasonal may be an allergic response.

During the interview, an alert physician notes spontaneous coughing, because its sound can yield useful information (eg, an audible rattle of secretions; the irritable, dry,

## Treatment

barking cough associated with acute tracheitis; or the low-pitched, blowing, bovine cough without an explosive start heard in a patient with a paralyzed recurrent laryngeal nerve). A patient who does not cough spontaneously should be asked to do so after the chest examination. Waiting until then is advisable because coughing earlier may dispel secretion sounds or crackles at the bases before they can be detected. Listening to the patient's lungs over the chest and at his open mouth both before and after the cough is useful because movement of secretions may alter physical findings dramatically. On the other hand, posttussive crackles may appear, particularly over tuberculous lesions in the upper lobes.

A major function of the cough reflex is to help clear secretions from the airways, particularly to help expel them through the larynx. Sputum production should be discussed during the history; questions about cough and sputum are usually related, but occasionally someone who denies coughing states that he produces sputum. Questions can help determine what the sputum looks like and how easily it is expelled. Changes in character (eg, from clear white mucus to yellowish, green, or brown purulent material) streaking and frank hemoptysis are important indicators of infection. Blood streaking and frank hemoptysis are important and likely to be noted by the patient. Gritty material in sputum, characteristic of bronchothiasis, may be less noticeable, and a patient may deny its presence when first asked but may later notice and report it.

If possible, the patient should expectorate a sputum specimen during the evaluation. Its gross appearance should be observed. A microscopic examination of a small drop taken from a thicker portion of the freshly collected sputum (placed on a glass slide without staining, compressed with a coverslip, and examined on low power) can provide useful information. The presence of squamous cells suggests that the material came from above the larynx; true sputum expelled from the airways is characterized by the presence of alveolar macrophages. Wright's stain shows the proportion of eosinophils; eosinophilia suggests an allergy. Neutrophils predominate more often in purulent sputum, indicating an inflammatory, usually infectious process. A Gram stain confirms the presence of bacteria and is the first step in their categorization.

Treatment of cough mainly consists of treating the underlying cause. A productive cough should not be suppressed except in special circumstances (eg, when it exhausts the patient or prevents rest and sleep) and generally not until the cause has been identified. Suppressing a productive cough is less advisable because sputum needs to be cleared. Cough remedies are categorized as antitussives and expectorants. Mucolytics, proteolytic enzymes, antihistamines and bronchodilators are sometimes used.

**Antitussives.** These drugs may be centrally or peripherally acting. Centrally acting antitussives inhibit or suppress the cough reflex by depressing the medullary cough center or associated higher centers. The most commonly used drugs in this group are dextromethorphan and codeine.

**Dextromethorphan,** a congener of the narcotic analgesic levorphanol, has no significant analgesic or sedative properties. It does not depress respiration in usual doses and is nonaddictive. No evidence of tolerance has been found during long-term use. The average dosage for adults is 15 to 30 mg 1 to 4 times/day given as a tablet or syrup; for children, 1 mg/kg/day is given in divided doses. Extremely high doses may depress respiration.

**Codeine,** which has antitussive, analgesic, and slight sedative effects, is especially useful in relieving painful cough. It also exerts a drying action on the respiratory mucosa that may be useful (eg, in bronchorrhea) or deleterious (eg, when bronchial secretions are already viscous). The average adult dosage is 10 to 20 mg po q 4 to 6 h as required, but doses as high as 60 mg may be necessary. The usual dosage for children is 1 to 1.5 mg/kg/day in divided doses q 4 to 6 h. Codeine in these amounts has minimal respiratory depressant effects. Nausea, vomiting, constipation, tolerance to antitussive as well as analgesic effects, and physical dependence can occur, but potential for abuse is low.

Other centrally acting antitussives include chlophedianol, levopropoxyphene, and noscapine in the nonnarcotic group and hydrocodone, hydromorphone, methadone, and morphine in the narcotic group.

Peripherally acting antitussives may act on either the afferent or the efferent side of the cough reflex. On the afferent side, an

antitussive may reduce the input of stimuli by acting as a mild analgesic or anesthetic on the respiratory mucosa, by modifying the output of stretch receptors in the lungs, or by relaxing the smooth muscle of the bronchial tree. In the presence of bronchospasm. On the efferent side, an antitussive may make secretions easier to cough up by increasing the efficiency of the cough mechanism. Peripherally acting agents are grouped as demulcents, local anesthetics, and humidifying aerosols and steam inhalations.

**Demulcents** are useful for coughs originating above the larynx. They form a protective coating over the irritated pharyngeal mucosa. They are usually given as syrups or lozenges and include acacia, licorice, glycerin, honey, and wild cherry syrups.

**Local anesthetics** (eg, lidocaine, benzocaine, hexylcaine hydrochloride, and tetracaine) are used to inhibit the cough reflex under special circumstances (eg, before bronchoscopy or bronchography). Benzonatate (100 mg po tid), a congener of tetracaine, is a local anesthetic; its antitussive effect may be due to a combination of local anesthesia, depression of pulmonary stretch receptors, and nonspecific central depression.

**Humidifying aerosols and steam inhalations** exert an antitussive effect by acting as a demulcent and by decreasing the viscosity of bronchial secretions. Inhaling water as an aerosol or as steam, or compound medicaments (sodium chloride, compound benzoin tincture, or eucalyptol), is the usual type of added medicaments has not been definitely proved.

**Expectorants:** These drugs are intended to help expel bronchial secretions from the respiratory tract by decreasing their viscosity, thus facilitating removal, and by increasing the amount of respiratory tract fluid, thus exerting a demulcent action on the mucosal lining. Most expectorants increase secretions through reflex irritation of the bronchial mucosa. Some, like the iodides, also act directly on the bronchial secretory cells and are excreted into the respiratory tract.

The use of expectorants is highly controversial. No objective experimental data confirm that any of the available expectorants increases sputum viscosity or eases expectoration. Data may be lacking partly because of inadequate technology for obtaining such evidence. Thus, the use and choice of expectorants are often based on tradition and the widespread clinical impression that they are effective in some circumstances.

Adequate hydration is the single most important measure that can be taken to encourage expectoration. If it is unsuccessful, using an expectorant in addition may produce the desired result. Iodides are effective in liquefying tenacious bronchial secretions (eg, in late stages of bronchitis, bronchiectasis, and asthma). A saturated solution of potassium iodide is the least expensive, most commonly used preparation. The initial dose is 0.3 mL po qid, in a glass of water, juice, or milk after meals and at bedtime, which is increased gradually to 1 to 4 mL qid. To be effective, iodides must be taken in doses approaching intolerance. Their usefulness is limited because of unpleasant taste and because side effects (eg, acneiform skin eruptions, coryza, erythema of face and chest, painful swelling of the salivary glands) are common. The side effects are reversible and subside when the drug is stopped. Iodinated glycerol is better tolerated than potassium iodide solution but is probably less effective. The usual oral dosage is 60 mg as tablets or elixir qid; *it should be avoided in patients sensitive to iodide.* Prolonged use of iodides (iodinated glycerol can lead to hypothyroidism.

Syrup of ipecac, 0.5 mL po qid (NOTE: This is much less than the emetic dose) can be used as an expectorant in patients sensitive to iodides. It is useful for relieving laryngeal spasm in children with croup and often clears thick, tenacious mucus from the bronchi.

Guaifenesin (100 to 200 mg po q 2 to 4 h) is the most commonly used expectorant in OTC cough remedies. It has no serious adverse effects, but there is no clear evidence of its efficacy.

Many other traditional expectorants (eg, ammonium chloride, terpin hydrate, creosote, squill) are found in numerous OTC cough remedies. Their efficacy is doubtful, particularly in the dosages of most preparations.

**Less commonly used drugs: Mucolytics** (eg, acetylcysteine) have free sulfhydryl groups that open mucoprotein disulfide bonds, reducing the viscosity of mucus. As a

rule, their usefulness is restricted to a few special instances such as liquefying thick, tenacious, mucopurulent secretions (eg, in chronic bronchitis and cystic fibrosis). Acetylcysteine is given as a 10 to 20% solution by nebulization or instillation. In some patients, mucolytics may aggravate airway obstruction by causing bronchospasm. If this occurs, these patients may inhale a nebulized sympathomimetic bronchodilator or take a formulation containing acetylcysteine (10%) and isoproterenol (0.05%) before taking the mucolytic.

**Proteolytic enzymes** (eg, pancreatic dornase) are useful only when grossly purulent sputum is a major problem. They seem to offer no advantage over mucolytics. Local irritation of the naso- and pharyngeal mucosa and allergic reactions commonly follow repeated doses. Dornase alfa, the new highly purified recombinant human deoxyribonuclease I (DNase), seems likely to become important in the treatment of cystic fibrosis, although its place has not been defined.

**Antihistamines** have little or no use in treating cough. Their drying action on the respiratory mucosa may be helpful in the early congestive phase of acute coryza but may be deleterious, especially to patients with a nonproductive cough resulting from retained viscous airway secretions. They may also be beneficial in chronic cough due to postnasal drip associated with allergic sinusitis.

**Bronchodilators** (eg, ephedrine and theophylline) may be useful if cough is complicated by bronchospasm. Atropine is undesirable because it thickens bronchial secretions. The anticholinergic drug ipratropium bromide can often ameliorate an irritating type of cough and does not adversely affect mucous secretions. Inhaled corticosteroids may become a mainstay in the treatment of cough in asthma.

**Drug combinations:** Many prescription and OTC cough remedies contain two or more drugs, usually in a syrup. They may include an opioid, usually an antitussive, an antihistamine, an expectorant, and a decongestant. Bronchodilators and antipyretics are also often present. These combinations are aimed at treating the many symptoms of an acute URI and should not be used to manage cough alone. Some antitussive combinations are appropriate for cough (eg, a centrally acting antitussive, such as dextromethorphan,

and a peripherally acting demulcent syrup for cough originating above the larynx. However, the components of some combinations (eg, expectorants and antihistamines) have opposing effects on respiratory tract secretions, and many combinations contain suboptimal or ineffective concentrations of potentially useful ingredients.

**Choice of drug therapy:** As a rule, when cough alone is a major problem, using a full dose of a single drug aimed at a specific component of the cough reflex is preferred. For simple suppression of a nonproductive cough, dextromethorphan is preferred, but codeine is also useful. The more potent narcotic antitussives should be reserved for cases in which analgesic and sedative effects are required and the cause is likely to be temporary. To increase bronchial secretion and liquefy viscous bronchial fluid, adequate hydration (by drinking water or inhaling steam) is used; a saturated solution of potassium iodide or syrup of ipecac given orally may be tried if hydration alone is unsuccessful. To relieve cough originating in the pharyngeal region, demulcent syrups or lozenges, combined if necessary with dextromethorphan, are used. For bronchoconstriction associated with cough, bronchodilators, possibly combined with expectorants, are advised; inhaled corticosteroids may be effective in some cases.

## DYSPNEA

*An unpleasant sensation of difficulty in breathing.*

Dyspnea is a symptom, not a sign, and is one of several sensations a patient may describe. A healthy person notes the increased ventilation required during exercise but does not interpret it as being particularly unpleasant unless extreme. Unpleasant or worrisome awareness that a small amount of exercise leads to a disproportionately large increase in ventilation is a common type of dyspnea, usually described as breathlessness or shortness of breath on exertion. At high altitude, a healthy person notes a similar disproportionately large increase in ventilation resulting from exertion and finds it limiting but usually not otherwise unpleasant.

Other sensations include awareness of increased muscular effort required to expand the chest, during inspiration or to expel air from the lungs, sensations of fatigue in the

spiratory muscles, awareness of a delay in leaving the lungs during expiration, the uncomfortable sensation that an inspiration is urgently needed before expiration is completed, and various sensations that are described as tightness in the chest. The last can probably include an awareness of collapse or hyperinflation of lung units, obstruction of airways, and distortion or displacement of lungs, mediastinum, diaphragm, or chest wall.

Afferent impulses to the brain that generate the sensation of dyspnea come from any different sites, such as the lungs, articulations of the rib cage, and the respiratory muscles, including the diaphragm. Peripheral and central chemoreceptors form part of the sensory input that appears to be involved in dyspnea, either directly or indirectly; other visceral, neural, and emotional stimuli may also participate.

## Clinical Types

**Physiologic:** The most common type of dyspnea occurs with physical exertion; ventilation is increased and maintained through an augmented respiratory stimulus to provide metabolic and other needed factors. Dyspnea is also caused during acute hypoxia, as can occur at high altitude, where the increased respiratory stimulus is in part the effect of arterial hypoxemia on the carotid bodies. Dyspnea is also evoked by a breathing high $CO_2$. Dyspnea without $CO_2$, or rebreathing in a closed space or obstruction. Dyspnea caused by increased $CO_2$ is similar to that caused by exercise and ventilation. However, awareness of increased ventilation or increased $CO_2$ in the inspired gas produces different sensations from those produced by reduced $O_2$. For most people, raised $CO_2$ is a much weaker stimulus to lose consciousness than hypercapnia, and increased ventilation may produce other effects, such as hypoxemia may produce unpleasant sensation, confusion, a vague unpleasant sensation, or even unconsciousness. A person who enters a closed space devoid of $O_2$ (eg, containing 100% $N_2$) may lose consciousness in about 1 sec; before swimmers who first hyperventilate to blow off $CO_2$, and thus delay the need to surface for air have been known to lose consciousness and drown because of hypoxia (see Ch. 285). Dyspnea may be minimal in carbon monoxide poisoning.

**Pulmonary:** The two major causes of pulmonary dyspnea are a restrictive defect with low compliance of the lungs or chest wall and an obstructive defect with increased resistance to airflow. Patients with restrictive dyspnea (eg, due to pulmonary fibrosis or chest deformities) are usually comfortable at rest but intensely dyspneic when exertion causes pulmonary ventilation to approach their greatly limited breathing capacity. In obstructive dyspnea (eg, in obstructive emphysema or asthma), increased ventilatory effort induces dyspnea even at rest, and breathing is labored and retarded, especially during expiration; this type of dyspnea always worsens during effort and exercise.

Physical findings may help determine the cause (eg, pleural effusion, pneumothorax, and sometimes interstitial lung disease). The signs of emphysema, bronchitis, and asthma are frequently helpful in defining the nature and severity of the underlying obstructive lung disease. Pulmonary function testing can provide numeric values for any restriction or airflow obstruction present (see Ch. 64).

Diffuse pulmonary disease, with or without hypoxemia, is often accompanied by hyperventilation and lowering of the $Pa_{CO_2}$. Thus, a patient with dyspnea may have a high $Pa_{O_2}$ and a low $Pa_{CO_2}$, presumably because of heightened stimuli from the stretch receptors in diseased lungs.

**Cardiac:** In early stages of heart failure (see Ch. 203), cardiac output fails to keep pace during exercise. Respiratory drive increases largely because of tissue and cerebral acidosis, sometimes resulting in hyperventilation. Various reflex factors, including stretch receptors in the lungs, may also contribute to hyperventilation. Shortness of breath is often accompanied by lassitude or a feeling of smothering or sternal oppression. In later stages of heart failure, the lungs are congested and edematous, the ventilatory capacity of the stiff lungs is reduced, and ventilatory effort is increased. Reflex factors, particularly the juxtacapillary (J) receptors in the alveolar-capillary septa, contribute to the inordinate increase in pulmonary ventilation. Noncardiogenic pulmonary edema or adult respiratory distress syndrome produces a similar clinical picture by similar mechanisms, but more acutely.

**Cardiac asthma** is a state of acute respiratory insufficiency with bronchospasm,

# Exhibit D

Nos. 02-55372, 02-55498

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FLORA MOTUS, individually, as Successor
of the Estate of Victor Motus,
Deceased, and as Guardian Ad Litem
for Lauren Motus, a Minor,

Plaintiff-Appellant and
Cross-Appellee,

v.

PFIZER, INC. (Roerig Division),

Defendant-Appellee and
Cross-Appellant.

AMICUS BRIEF FOR THE UNITED STATES
IN SUPPORT OF THE DEFENDANT-APPELLEE AND
CROSS-APPELLANT, AND IN FAVOR OF REVERSAL OF THE DISTRICT
COURT'S ORDER DENYING PARTIAL SUMMARY JUDGMENT TO
DEFENDANT-APPELLEE AND CROSS-APPELLANT

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DEBRA W. YANG
United States Attorney

OF COUNSEL:

DANIEL E. TROY
Chief Counsel
Food and Drug Administration

LYNN WHIPKEY MEHLER
Associate Chief Counsel for Drugs
Food and Drug Administration

HEIDI P. FORSTER
Assistant Chief Counsel for Drugs
Food and Drug Administration

DOUGLAS N. LETTER
(202) 514-3602
Appellate Litigation Counsel

ROBERT D. KAMENSHINE
(202) 514-2494
Attorney, Appellate Staff
Civil Division, Room 9012
601 D Street, N.W.
Washington, D.C. 20530-0001

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF THE
UNITED STATES .................................................. 1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW .................. 2

STATEMENT OF THE CASE ........................................ 3

SUMMARY OF ARGUMENT ......................................... 12

ARGUMENT ................................................... 15

    THE FDCA AND APPLICABLE REGULATIONS PREEMPT
    MOTUS'S TORT CLAIMS IN THAT, AT THE TIME
    ZOLOFT WAS PRESCRIBED, ANY WARNING THAT
    SUGGESTED A CAUSAL RELATION BETWEEN ZOLOFT
    AND SUICIDE WOULD HAVE BEEN FALSE OR
    MISLEADING, AND THUS WOULD HAVE MISBRANDED
    THE DRUG ............................................... 15

    A.    A State May Not Hold A Drug's Manufacturer
        Liable For Having Omitted A Warning That
        Would Have Misbranded The Drug In
        Violation Of Federal Law ......................... 15

    B.    Any Warning Of A Causal Relation Between
        Zoloft And Suicide Would Have Misbranded
        The Drug ......................................... 17

    C.    Any Warning Of A Causal Relation Between
        Zoloft And Suicide Would Have Obstructed
        The FDCA's Purposes And Objectives ............... 23

CONCLUSION ................................................. 25

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

<u>CASES</u>:

<u>Caraker</u> v. <u>Sandoz Pharms. Corp.</u>,
    172 F. Supp. 2d 1018 (S.D. Ill. 2001) .................. 19

<u>Fireman's Fund Ins. Co.</u> v. <u>City of Lodi</u>, __ F.3d __
    2002 WL 1792612 9 (9th Cir. 2002) ................... 15-16

<u>Florida Lime & Avocado Growers, Inc</u>. v. <u>Paul</u>,
    373 U.S. 132 (1963) ................................. 15

<u>Geier</u> v. <u>American Honda Motor Co.</u>,
    529 U.S. 861(2000) ........................... 15, 19, 23

<u>Henley</u> v. <u>Food And Drug Admin.</u>, 77 F.3d 616
    (2d Cir. 1996) ..................................... 16

<u>Hill</u> v. <u>Searle Labs.</u>, 884 F.2d 1064
    (8th Cir. 1989) .................................... 18

<u>Hurley</u> v. <u>Lederle Labs.</u>, 863 F.2d 1173
    (5th Cir. 1988) .................................... 16

<u>Jones</u> v. <u>Rath Packing Co.</u>, 430 U.S. 519
    (1977) ............................................. 23

<u>Public Citizen Health Research Group</u> v.
    <u>Commissioner, Food & Drug Admin.</u>, 740 F.2d 21
    (D.C. Cir. 1984) ................................... 16

<u>United States</u> v. <u>Locke</u>, 529 U.S. 89 (2000) ............ 17, 20

<u>Wooderson</u> v. <u>Ortho Pharm. Corp.</u>,
    235 Kan. 387 P.2d 1038,
    <u>cert. denied</u>, 469 U.S. 965(1984), ..................... 22

<u>CONSTITUTION</u>:

    United States Constitution,(art. VI, cl.2) ............... 15

<u>STATUES</u>:

**The Food, Drug and Cosmetic Act:**

        21 U.S.C. 301 <u>et seq</u>. ................................ 2
        21 U.S.C. 331(a) ......................... 3, 4, 6, 7, 16
        21 U.S.C. 331(b) ......................... 3, 4, 9, 6, 7, 16
        21 U.S.C. 331(k) ......................... 3, 4, 6, 7, 16

21 U.S.C. 332 ............................................ 6
21 U.S.C. 333(a) ........................................ 6
21 U.S.C. 344(a) ........................................ 6
21 U.S.C. 352 ........................................... 7
21 U.S.C. 352(a) .............................. 3, 5, 16
21 U.S.C. 352(f) .................................. 6, 16
21 U.S.C. 355 ........................................... 5
21 U.S.C. 355(a) ........................................ 7
21 U.S.C. 355(b) ........................................ 4
21 U.S.C. 355(b)(1)(a) .................................. 4
21 U.S.C. 355(b)(1)(F) .................................. 5
21 U.S.C. 355(c) ........................................ 6
21 U.S.C. 355(d) .............................. 4, 11, 18
21 U.S.C. 355(d)(5) ..................................... 5
21 U.S.C. 355(d)(7) ..................................... 6
21 U.S.C. 355(j) ........................................ 6
21 U.S.C. 375(b) ........................................ 7
21 U.S.C. 393(b)(2)(B) .................................. 4

28 U.S.C. 517 ........................................... 7

**REGULATIONS:**

21 C.F.R. 5.10 .......................................... 2
21 C.F.R. 10.30 ......................................... 7
21 C.F.R. Part 201 (Subparts A,B,G) ..................... 6
21 C.F.R. 201.56 .................................... 6, 16
21 C.F.R. 201.56(a) ................................ 11, 18
21 C.F.R. 201.56(b) ............................. 3, 11, 18
21 C F R 201.57 .................................... 6, 16
21 C.F.R. 201.57(e) .................................... 12
21 C.F.R. 314.70 ........................................ 6
21 C.F.R. 314.70(b) ..................................... 6
21 C F R 314.70(c) ...................................... 6
21 C.F.R. 314.70(c)(2)(i) .............................. 17

**RULES:**

Fed. R. App. P. 29(a) ................................... 2

**MISCELLANEOUS:**

Lars Noah, Medicine's Epistemology:
Mapping The Haphazard Diffusion Of Knowledge
In The Biomedical Community,
44 Ariz. L. Rev. 373 (2002) ........................... 24

Restatement (Third) Of Torts §6 cmt. c (1998) ....... 17-18

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————

Nos. 02-55372, 02-55498

———————

FLORA MOTUS, individually, as Successor
of the Estate of Victor Motus,
Deceased, and as Guardian Ad Litem
for Lauren Motus, a Minor,

Plaintiff-Appellant and
Cross-Appellee,

v.

PFIZER, INC. (Roerig Division),

Defendant-Appellee and
Cross-Appellant.

———————

AMICUS BRIEF FOR THE UNITED STATES
IN SUPPORT OF THE DEFENDANT-APPELLEE AND
CROSS-APPELLANT, AND IN FAVOR OF REVERSAL OF THE DISTRICT
COURT'S ORDER DENYING PARTIAL SUMMARY JUDGMENT TO
DEFENDANT-APPELLEE AND CROSS-APPELLANT

———————

## STATEMENT OF INTEREST OF
## THE UNITED STATES

This case involves a significant preemption issue concerning

the extent, if any, to which the manufacturer of a drug may be

held liable in tort for a failure to warn of an alleged danger,

notwithstanding the Food and Drug Administration's (FDA's)

repeated and contemporaneous determination that there is no

scientific basis for such warning.  The FDA, the federal agency

charged with regulating the manufacture, sale, and labeling of

prescription drug products,[1] has a clear interest to ensure that state tort law does not undermine the agency's authority to protect the public health through enforcement of the FDCA's prohibition against false or misleading labeling of drug products. To require a warning of a supposed danger that FDA concludes has no actual scientific basis, no matter the warning's language, would be to require a statement that would be false or misleading, and thus contrary to federal law. In such a case, federal law must prevail. The United States files this <u>amicus curiae</u> brief pursuant to Fed. R. App. P. 29(a) and 28 U.S.C. 517 to make clear the basis for federal preemption and the error in the district court's opinion.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Plaintiff-Appellant and Cross-Appellee Flora Motus's husband, who had been suffering from depression, committed suicide within a week of his beginning to take the anti-depressant prescription drug, Zoloft, prescribed by his doctor. As of that time, FDA had examined the matter and had repeatedly found that there was no causal relation between taking the class of drug products known as SSRIs, which includes Zoloft, and an

---

[1] The FDA is a component of the United States Department of Health and Human Services. The Federal Food, Drug and Cosmetic Act (FDCA, 21 U.S.C. 301 <u>et seq.</u>) vests regulatory and enforcement authority in the Secretary of Health and Human Services, who has delegated his authority to the Commissioner of the FDA. 21 C.F.R. 5.10.

increased risk of suicide.  Zoloft's manufacturer, Pfizer, while providing the warnings specified by FDA under federal law, had not provided any warning of such a possible relationship.  Motus seeks tort damages against Pfizer based on that omission.

The question presented is:

Whether the FDCA (21 U.S.C. 331(a), (b), (k); 352(a)), and applicable regulations (21 C.F.R. 201.56(b)) preempt plaintiff's tort claims in that, at the time Zoloft was prescribed, any warning that suggested a causal relation between Zoloft and suicide would have been false or misleading, and thus would have misbranded the drug in violation of federal law.

## STATEMENT OF THE CASE

1.  This is a suit against a drug manufacturer, Pfizer, brought by Flora Motus, the widow of a former patient, Victor Motus.  SER 1189.  Victor Motus suffered from depression.  <u>Id</u>. In November 1998, he committed suicide after having taken, as prescribed, Pfizer's anti-depressant drug, Zoloft, for approximately one week.  <u>Id</u>.

Flora Motus filed a lawsuit alleging that (1) Pfizer "'negligently * * * fail[ed] to adequately warn the medical community, the general public and plaintiff's [husband] * * * of the dangers, contraindications and side effects * * * of Zoloft,'" (2) "'Zoloft was not properly labeled * * * and was not accompanied by proper warnings for safe, informed use * * * [and

3

(3)] the labeling ... did not warn physicians in general and [Victor Motus] in particular of the dangers inherent in its use, particularly that the drug can cause the user to become violent and suicidal.'" <u>Id</u>. at 1189-90. Significantly, for purposes of this case, Pfizer had provided verbatim the suicide-related warning specified by FDA for its product. SER 1190, 1192.

The district court rejected Pfizer's argument that federal regulation of prescription drugs preempted Ms. Motus's claims as related to failure to warn. <u>Id</u>. at 1190. But the court ultimately granted summary judgment to Pfizer on the ground that her claims were barred by lack of causation. ER 536. Motus filed an appeal from that judgment, and Pfizer filed a cross appeal on the denial of partial summary judgment as to preemption.

**2.** Congress charged FDA with ensuring that drugs sold in the United States are safe and effective (21 U.S.C. 355(d) and 393(b)(2)(B)) and not misbranded. 21 U.S.C. 331(a), (b), and (k). To obtain the agency's approval of a drug, a manufacturer must submit a New Drug Application (NDA). 21 U.S.C. 355(b). The applicant must provide "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 U.S.C. 355(b)(1)(A). The applicant must also include "adequate tests * * * to show whether or not such drug is safe for use under the conditions

4

prescribed, recommended, or suggested in the proposed labeling."
21 U.S.C. 355(d). An applicant seeking approval of a new drug
must submit proposed labeling in the NDA. 21 U.S.C.
355(b)(1)(F). In addition, the applicant must furnish
"substantial evidence that the drug will have the effect it
purports or is represented to have under the conditions of use
prescribed, recommended, or suggested in the proposed labeling."
21 U.S.C. 355(d)(5). Where FDA concludes that a prescription
drug is both safe and effective under the conditions of use
prescribed, recommended, or suggested in the proposed labeling,
the agency approves the NDA. 21 U.S.C. 355.

Under federal law, the evaluation of a drug's safety and
effectiveness is thus inextricably intertwined with its labeling.
FDA's decision as to appropriate labeling is based on the
evidence submitted by the applicant, as well as on the agency's
review of other relevant information. Commonly, a drug
manufacturer and FDA will discuss in detail the proposed drug
labeling, including the various warnings to be placed on the
product. Based on the known scientific evidence, appropriate
warnings are drafted to express the known risks, while avoiding
the statement of unsubstantiated risks that may unnecessarily
deter use of the drug. When the agency ultimately approves the
NDA, it also approves the final version of the product labeling.

FDA may not approve an NDA that includes labeling that is false or misleading in any particular.  21 U.S.C. 355(c), 355(d)(7).

The FDCA prohibits the misbranding of drugs in interstate commerce.  21 U.S.C. 331(a), (b), (k).  Violators may be subject to regulatory and enforcement actions, including injunction (21 U.S.C. 332), seizure (21 U.S.C. 331(b), 344(a)), and criminal prosecution (21 U.S.C. 333(a)).  A drug is misbranded when, among other things, its labeling is false or misleading in any particular or does not provide adequate warnings against any use dangerous to health.  21 U.S.C. 352(a), (f), (j).  FDA's regulations establish specific requirements for prescription drug product labeling, 21 C.F.R. Part 201 (Subparts A, B, G).  These requirements are designed to mandate warnings that reflect the known risks based on reliable scientific evidence.  21 C.F.R. 201.56, 201.57.

Drug manufacturers generally may not deviate from FDA-approved product labeling without submitting an NDA supplement that provides a full explanation for the basis of the change.  21 C.F.R. 314.70.  FDA permits two kinds of labeling supplements: (1) "pre-approval supplements," which require FDA approval prior to a change; and (2) "changes being effected supplements," which the manufacturer may implement before FDA approval.  21 C.F.R. 314.70(b), (c).  A manufacturer may use a "changes being

6

effected" supplement to make labeling changes to add or strengthen a warning, but must still give to FDA "a full explanation of the [scientific] basis for the change." 21 C.F.R. 314.70(c). FDA then conducts an analysis to determine whether the proposed labeling change is appropriate. If the agency disapproves the proposed changes, the firm may not utilize the unapproved labeling.[2] 21 U.S.C. 352, 355(a).

3. In 1988, Pfizer filed its NDA for Zoloft, one of a class of "'selective serotonin reuptake inhibitors'" (SSRIs). SER 1191. The submissions included information about "suicidality" in patients given Zoloft, placebos, and other drugs. Id. at 1192. As it often does in considering NDAs, in 1990, FDA had convened a committee of experts, the Psycho-pharmacological Drugs Advisory Committee (PDAC), to review the Zoloft NDA. SER 1192. During the meeting, one of the agency's experts, "Dr. James Knudson, addressed suicide attempts in Zoloft, placebo and active-control treated patients during the clinical studies of [the drug]." Id. Dr. Knudson stated that the data "'show[ed] that disproportionate numbers of suicides do

---

[2] FDA also has the authority to prohibit the marketing of misbranded products in interstate commerce (21 U.S.C. 331(a), (b), and (k)) and to alert patients and their physicians if it determines that a prescribed drug creates an "imminent danger to health or gross deception of the consumer" (21 U.S.C. 375(b)). Additionally, private persons and organizations may request FDA to take either such measure or to require alterations to the labeling, pursuant to a "citizen petition" provision. 21 C.F.R. 10.30.

not occur among the three treatment groups.'"  Id.  Subsequently,
the PDAC unanimously concluded that Zoloft "'is safe when used in
the treatment of depression.'"  Id.

In 1991, FDA issued its "approvable" letter for the Zoloft
NDA.  Id.  The precaution section of the proposed labeling, which
FDA instructed Pfizer to use "verbatim," included the following
statement:

> Suicide--The possibility of a suicide attempt
> is inherent in depression and may persist
> until significant remission occurs.  Close
> supervision of high risk patients should
> accompany initial drug therapy.
> Prescriptions for Zoloft (sertraline) should
> be written for the smallest quantity of
> capsules consistent with good patient
> management, in order to reduce the risk of
> overdose.  SER 1192.

On December 30, 1991, FDA granted approval to market Zoloft
for treatment of depression.  Id. at 1193.  The agency's
"'Summary Basis of Approval,'" which addressed the occurrence of
suicide in the database of tested Zoloft users, stated that
trials showed "'results favoring [the drug] over placebo and
supported the comparability of [Zoloft] and active control
groups.'"  Id.  Later, FDA also approved Zoloft as safe and

8

effective for treatment of four other psychiatric disorders
(three approvals before the death of Victor Motus, and one
thereafter).  Id. at 1193-94.  In connection with one of the
approvals that occurred before the suicide of Mr. Motus, a report
prepared by Pfizer at FDA's request addressed "the relation
between the use of Zoloft by adults and children for obsessive
compulsive disorder and suicide related behavior."  Id. at 1193
n.4.  The report concluded that the "rate of suicidal behavior
for adolescents treated with sertraline for obsessive-compulsive
disorder was within the range described in normal population
samples of adolescents."  Id. at 1193-94 n.4.

Before and during FDA's consideration of the Zoloft NDA (as
late as June 1997), the agency three times considered and
rejected claims that other SSRIs, such as Prozac, cause suicide.
SER 1194-95.  PDAC, FDA's expert committee, voted unanimously
that there was no "'credible evidence [(1)] to support a
conclusion that antidepressant drugs cause the emergence and/or
intensification of suicidality and/or other violent behaviors,'"
and (2) no evidence "'to indicate that a particular drug or drug
class poses a greater risk for the emergence and/or
intensification of suicidal thoughts and acts and/or violent
behaviors.'"  Id.  Addressing the PDAC on the subject of one
SSRI, Prozac, Dr. Paul Leber, then Director of FDA's Division of
Neuropharacological Drug Products, had expressed his "'concern'"

9

that an unnecessary warning "'beyond being false and misleading, might well have a net adverse effect'" on the drug's beneficial use. (SER 1207).

4. In denying partial summary judgment to Pfizer, the district court held that the company "failed to establish that a plaintiff is barred from asserting state law tort claims based on failure to warn of a suicide risk."[3] SER 1190. The court noted that "Pfizer makes no express or field preemption argument," but the company argues that "'plaintiff's attempt to use state tort law to require warnings that Zoloft causes suicide' conflicts with (1) FDA's various determinations regarding Zoloft's and SSRI's warnings and (2) the federal statutory and regulatory objective of ensuring that labeling effectively communicates the scientific information physicians need to make informed judgments." Id. at 1198.

The court observed that "most courts have found that FDA regulations as to design and warning standards are minimum standards which do not preempt state law defective design and failure to warn claims." SER 1198-99. The court stated that "even if standards deemed 'minimum' could conflict with state law tort suits, the warning labeling standards here do not because

_____

[3] In a subsequent opinion, however, the district court granted summary judgment in favor of Pfizer on the ground that any failure to warn did not cause the suicide. ER 535.

10

* * * Pfizer has not established that federal regulations or FDA meant to prohibit Pfizer from strengthening its warnings." Id. at 1199 n.7. The court then acknowledged that "some of the federal statutory and regulatory law Pfizer cites does appear to apply to Zoloft's warning label," ("prescription drug labeling may not be 'false or misleading in any particular'" (21 U.S.C. 355(d); 21 C.F.R. 201.56(b)); "labeling must be based on 'the essential scientific information needed for the safe and effective use of the drug'" (21 C.F.R. 201.56(a)). SER 1203. Nevertheless, the court found that "that law does not establish conflict preemption because Pfizer has not established that plaintiff's theory of liability would require warnings that would violate federal law."

In these circumstances, the court "f[ound] Pfizer's attack overbroad" in that while "certain suicide warnings could violate federal law because they were false or misleading or were not based on 'the essential scientific information needed' for safe use, the Court does not think that any and every suicide-related warning that might be required under state law is necessarily false or misleading, or not based on 'the essential scientific information needed' for safe use." Id. at 1203. The court acknowledged that "[o]n the occasions cited by Pfizer that FDA considered links between suicide and SSRIs, FDA did find [("consistent with the regulatory provision governing warning

11

labels, 21 C.F.R.  201.57(e), which indicates only those warnings that must be included in drug labeling, but does not prohibit any warnings")] that the evidence did not support requiring manufacturers to include additional suicide-related warnings." SER 1204.  The court stressed, however, that "FDA never stated that it would be impermissible to include additional warnings." Id.

The court also rejected Pfizer's argument that the plaintiff's state law failure to warn claims obstruct congressional purposes.  Id. at 1205.  The court emphasized that since "plaintiff's * * * claims do not necessarily call for false and misleading labeling or labeling not based on scientific information," such claims "do not necessarily conflict with the regulations' straightforward purpose of ensuring that doctors receive accurate, scientifically based information."  Id.  The Court also was "not persuaded that FDA has found or has relied on a finding that strengthened suicide warnings would overdeter SSRI use," and "f[ound] an absence of persuasive evidence establishing a threat of overdeterrence from strengthening suicide warning labeling for SSRIs."  SER 1207.

## SUMMARY OF ARGUMENT

1.  The Supremacy Clause bars a state from demanding that the manufacturer of a drug choose either to avoid tort liability or comply with the FDCA.  Yet, under Motus's theory of liability,

12

<u>any</u> omitted warning would have had to state a causal relation between Zoloft and suicide - the very relation that FDA determined was scientifically unsupported.  In short, any warning by Pfizer that suggested causation would have been false or misleading, and thus a misbranding that could have subjected the company to federal regulatory and enforcement action.

As the district court observed, FDA regulations do permit a drug's manufacturer to "'add[] or strengthen[] a contraindication, warning, precaution, or adverse reaction'" "'before FDA approval.'"  SER 1201.  Ultimately, however, FDA, <u>not</u> each state court system applying its own standards, must approve the warning.  And given the agency's repeated negative determinations on the subject, had Pfizer given a warning as to a causal relation between Zoloft and suicide, FDA would have disapproved that warning.  Indeed, based on its current scientific knowledge, FDA would still do so today.

Significantly, the district court acknowledges the "occasions" (as recently as June 1997, less than 1 ½ years prior to Mr. Motus' suicide) on which "FDA considered links between suicide and SSRIs," such as Zoloft, and the agency concluded "that the evidence did not support requiring manufacturers to include additional suicide-related warnings."  SER 1204.  In fact, the court accepts the possibility that certain additional warnings would have been inconsistent with FDA's finding, and

13

thus "false or misleading." Id. at 1203.  The court's response
is unpersuasive.

     First, the court notes that the "FDA never stated that it
would be impermissible to include additional warnings." Id. at
1204.  But the implication that there must be such a statement
(forbidding a warning that neither FDA nor Pfizer considered to
be scientifically justified) to support a finding of preemption
under the FDCA's self-executing provisions is unsupported and
erroneous.  Second, focusing on what it terms the "overbr[eadth]"
(id. at 1203) of Pfizer's preemption argument, the court
emphasizes that it is evaluating only the firm's attack on
Motus's general allegation of failure to warn, so that one or
more unspecified warnings might be valid.  But Motus's case, as
related to failure to warn, entirely depended on Pfizer's failure
to provide a warning that in some way called attention to a
causal relation between Zoloft and suicide.  And in 1998, when
Zoloft was prescribed for Victor Motus, all imaginable warnings
that could reasonably have been read as describing or alluding to
such a relation would have been false or misleading for lack of
scientific support, and therefore in conflict with federal law.

     2.  The Supremacy Clause also bars an application of state
law that would obstruct the purposes and objectives of federal
law.  Here, for many of the same reasons just discussed,
imposition of liability on the basis of a failure to warn would

                              14

thwart the FDCA's objective of ensuring a drug's optimal use by requiring that manufacturers disseminate only truthful information as to its effects.  Thus, the dissemination of a false warning that a patient taking Zoloft would incur the most dire risk - that the drug could cause suicide - would unjustifiably curtail its otherwise beneficial use.

<div align="center">ARGUMENT</div>

**THE FDCA AND APPLICABLE REGULATIONS PREEMPT MOTUS'S TORT CLAIMS IN THAT, AT THE TIME ZOLOFT WAS PRESCRIBED, ANY WARNING THAT SUGGESTED A CAUSAL RELATION BETWEEN ZOLOFT AND SUICIDE WOULD HAVE BEEN FALSE OR MISLEADING, AND THUS WOULD HAVE MISBRANDED THE PRODUCT**

**A.    A State May Not Hold A Drug's Manufacturer Liable For Having Omitted A Warning That Would Have Misbranded The Drug In Violation Of Federal Law**

Under the Supremacy Clause (U.S. Const. art. VI, cl.2), a state may not cause a drug's manufacturer to choose either to avoid tort liability or comply with federal law.  <u>Geier</u> v. <u>American Honda Motor Co.</u>, 529 U.S. 861, 873 (2000) (Supremacy Clause forbids "'conflicts' that make it 'impossible' for private parties to comply with both state and federal law"); <u>Florida Lime & Avocado Growers, Inc.</u> v. <u>Paul</u>, 373 U.S. 132, 142-43 (1963 ("federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility"); <u>Fireman's Fund Ins. Co.</u> v. <u>City of Lodi</u>, __ F.3d __, No. 99-

<div align="center">15</div>

15614, 2002 WL 1792612 *9 (9th Cir. Aug. 6, 2002).  Thus, despite
the district court's ultimate ruling, the court properly
recognized that state law may not require the manufacturer of a
drug to warn of a specific danger that FDA, based on scientific
analysis, concludes does not exist.[4]  Such a warning label, one
not based on reliable scientific evidence of known risks (21
C.F.R. 201.56, 201.57.), would be "false or misleading" (21
U.S.C. 352(a), 352(f)), and thus would misbrand the drug.  21
U.S.C. 331(a), (b).[5]  It is a violation of the FDCA to market a
misbranded product.  21 U.S.C. 331(a), (b), and (k).

---

[4]    See Hurley v. Lederle Labs., 863 F.2d 1173, 1179 (5th
Cir. 1988) ("assuming that the FDA has processed all the relevant
and available information in arriving at the prescribed warning,
its decision as to the proper wording must preempt by implication
that of a state"); Robert B. Leflar & Robert S. Adler, The
Preemption Pentad: Federal Preemption Of Products Liability
Claims After Medtronic, 64 Tenn. L. Rev. 691, 717 (1997)
(supporting preemption "if FDA is aware of the full evidence
concerning the alleged risk * * * and has determined
* * * that because of the data's speculative nature, that the
alleged risk may not be included in the drug's labeling").

[5]    See Henley v. Food And Drug Admin., 77 F.3d 616, 621 (2d
Cir. 1996) ("FDA possesses the requisite know-how * * * to
determine the most accurate and up-to-date information regarding
a particular drug, and how those data affect human usage");
Public Citizen Health Research Group v. Commissioner, Food & Drug
Admin., 740 F.2d 21, 28 (D.C. Cir. 1984) (Congress has entrusted
to FDA, "in the first instance," "subtle scientific judgments" as
to whether a drug "'may be dangerous.'").

16

**B.    Any Warning Of A Causal Relation Between
Zoloft And Suicide Would Have "Misbrand[ed]"
The Drug**

The district court erred when, based on FDA regulations

permitting a drug's manufacturer to "'add[] or strengthen[] a

contraindication, warning, precaution, or adverse reaction'"

"'before FDA approval'" (emphasis supplied) (<u>citing</u> 21 C.F.R.

314.70(c)(2)(i)), the court concluded that "[t]here appears to be

no inherent conflict between state law requiring a stronger

warning for Zoloft and the FDA's approval of Zoloft's present

warning."  SER 1201.  The regulations invoked by the court do not

dispense with review by FDA.  Ultimately, FDA, <u>not</u> each state

applying its own standards, must approve the warning.  Certainly,

given the agency's repeated negative determinations on the

subject, had Pfizer given a warning as to a causal relation

between Zoloft and suicide, FDA would have disapproved that

warning.  As discussed below, the warning would have misbranded

the product because the warning would not have been supported by

science.  At least in such circumstances, preemption is

required.[6]  <u>See</u> <u>Restatement (Third) Of Torts</u> §6 cmt. c (1998)

---

[6] Thus, it is unnecessary to address here the argument that
the scheme for FDA's initial specification of warnings and for
the manufacturer's subsequent modification of or addition to such
warnings is sufficiently comprehensive as to foreclose the states
from requiring warnings other than those specified by FDA.  <u>See</u>
<u>United States</u> v. <u>Locke</u>, 529 U.S. 89 (2000) (addressing claim of
field preemption).

17

(recognizing that federal law may preempt state law as to adequate warnings).

Significantly, the district court acknowledges that "[o]n the occasions cited by Pfizer that FDA considered links between suicide and SSRIs, FDA did find that the evidence did not support requiring manufacturers to include additional suicide-related warnings." SER 1204. The court further acknowledges that (1) there is the possibility that certain additional warnings would have been inconsistent with FDA's finding, and thus subject to the requirements that prescription drug labeling may not be "false or misleading in any particular" (21 U.S.C. 355(d); 21 C.F.R. 201.56(b)), and (2) labeling must be based on "the essential scientific information needed for the safe and effective use of the drug" (21 C.F.R. 201.56(a)).[7] SER 1203. The court then responds, however, that "FDA never stated that it would be impermissible to include additional warnings." SER 1204.

Yet FDA does not have to state in advance that a particular warning would misbrand the product in order to make the placement of such a warning a violation of federal law. The manufacturer's

_____

[7] Given this specific conflict, it is irrelevant that, as stated by the district court, "most courts have found that FDA regulations as to design and warning standards are minimum standards which do not preempt state law defective design and failure to warn claims" (citing Hill v. Searle Labs., 884 F.2d 1064, 1068 (8th Cir. 1989)). SER 1198-99.

18

inclusion of a false or misleading warning misbrands the product per se. And the court offers no basis for its erroneous implication that such a prior statement by FDA (that would bar a warning that neither the agency nor Pfizer considered to be scientifically justified) is necessary to support a finding of preemption by the self-executing statutory prohibition of misbranding. See Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 884 (2000) ("the Court has never before required a specific, formal agency statement identifying conflict in order to conclude that such a conflict in fact exists").

The court also emphasizes that it was evaluating only Pfizer's attack on "plaintiff's general allegation of failure to warn" (SER 1203), and that "plaintiff evidently has not yet identified the precise warning that she thinks Pfizer should have provided."[8] SER 1203 n.10. Thus, the court concludes that "Pfizer has not established that plaintiff's theory of liability would require warnings that would violate federal law." In essence, the court focused on what it termed the "overbr[eadth]" (id. at 1203) of Pfizer's preemption argument.[9]

_____

[8] Arguably, the district court should have required the plaintiff to be more specific. But it is clear from the complaint that the warning had to deal in some fashion with Zoloft's alleged causal role in suicide.

[9] In Caraker v. Sandoz Pharms. Corp., 172 F. Supp. 2d 1018, 1031-43 (S.D. Ill. 2001), involving a postpartum lactation control drug, the court applied a similar analysis in finding
                                                      (continued...)

19

The court is correct that not every conceivable additional warning that Pfizer might have given as to Zoloft would have been false or misleading, given the FDA's scientific determinations as specifically directed to causation of suicide.  For example, it might have come to Pfizer's attention that there was an unforeseen problem with an allergic reaction to Zoloft.  The critical point is that, even though Mrs. Motus did not state the specific warning that Pfizer allegedly had a duty under state law to provide, her case, as it related to failure to warn, entirely depended on Pfizer's failure to provide a warning that in some way called attention to an asserted causal relation between Zoloft and suicide.

The example of a supposedly permissible SSRI warning actually invoked by the court fits that description.  The warning, recommended by the British counterpart to the FDA (the Medicines Control Agency) - that "'occasionally, thoughts of suicide or self harm may occur or increase in the first few weeks

---

[9](...continued)
that there was no preemption in a failure to warn case.  As in the present case, the court emphasized the "'minimum' standards approach used by "many courts."  172 F. Supp. 2d at 1033. Unlike the court here, however, Caraker relied on the presumption that absent express preemption, Congress does not intend to displace state law, particularly in the areas such as health and safety that the states have traditionally occupied.  But see United States v. Locke, 529 U.S. 89, 108 (2000) ("'assumption'" of non-preemption is not triggered when the State regulates in an area where there has been a history of significant federal presence").  Federal food and drug regulation legislation was enacted in 1906, and thus has been in place over nearly 100 years.

20

of treatment with sertraline, until the antidepressant effect becomes apparent.  Tell your doctor immediately if you have any distressing thoughts or experiences'" (SER 1203) - is ambiguous as to causality.[10]  Since the British warning could reasonably have been construed as suggesting a casual relation to suicide, federal law would have barred Pfizer from giving it.

Thus, in 1998, when Zoloft was prescribed for Victor Motus, any warning, no matter how worded, that could reasonably have been read as describing or alluding to such a relation would have been false or misleading, and therefore in conflict with federal law because there was no (and still is not) scientific support for such a warning.  This is not just because FDA had rejected any link between Zoloft and suicide when, in 1991, the agency approved the drug as a treatment for depression.[11]  Subsequently, in response to petitions making similar allegations as to the

---

[10]  The Medicines Control Agency had also concluded that no causal relation had been "'scientifically established.'"  See Plaintiff's Opposition To Defendant's Motion For Partial Summary Judgment Re: Inadequate Warning Claims (Preemption/Standard Of Care) 23.

[11]  On four subsequent occasions, three before (October, 1996 and July and October, 1997) and one (December 1999) after Mr. Motus's death, FDA approved Zoloft for treatment of other psychiatric disorders and did not require the inclusion of a causation warning in the labeling.  SER 1193.

21

related drug, Prozac, FDA found <u>no</u> link between <u>antidepressants</u> and suicide.[12]

Additionally, in June 1997, the PDAC voted unanimously that there was no "credible evidence (1) to support a conclusion the antidepressant drugs cause the emergence and/or intensification of suicidality and/or other violent behaviors," or (2) "to indicate that a particular drug or drug class poses a greater risk for the emergence and/or intensification of suicidal thoughts and acts and/or violent behaviors." SER 1195. FDA informs us that in 2002 the agency completed an internal review of SSRIs.[13] This review of the data disclosed that there is no difference in the risk of suicide between those on SSRI's and those on placebo. Thus, the agency concluded once again that, at present, no credible scientific evidence exists to show that SSRI drug products, including Zoloft, cause suicide.

---

[12] Thus, the circumstances here are unlike those in <u>Wooderson</u> v. <u>Ortho Pharm. Corp.</u>, 235 Kan. 387, 409, 681 P.2d 1038, 1057 (FDA's "letter [(relied on by drug manufacturer)] <u>cannot</u> be construed as a <u>clear determination</u> * * * that contraceptive-induced HUS [(hemolytic uremic syndrome)] does not merit warnings, and thus this argument has no merit") (emphasis supplied), <u>cert. denied</u>, 469 U.S. 965 (1984).

[13] <u>See</u> Andrew D. Mosholder, Medical Officer, FDA Division of Neuropharmacological Drug Products, <u>Mortality and Suicide Rates in Randomized Controlled Trials of Psychiatric Drugs: Update 2002</u>, 42nd Annual National Institute of Mental Health's New Clinical Drug Evaluation Unit Meeting (June 10-13, 2002).

22

C.   Any Warning Of A Causal Relation Between
     Zoloft And Suicide Would Have Obstructed The
     FDCA's Purposes And Objectives

Given the just discussed conflict, the effectuation of

California tort law in this case would also impermissibly

"prevent 'the accomplishment and execution of the full purposes

and objectives of Congress'" (Jones v. Rath Packing Co., 430 U.S.

519, 543 (1977)).  See Geier, 529 U.S. at 873 ("Court has not

* * * driven a legal wedge – only a terminological one – between

'conflicts' that prevent or frustrate the accomplishment of a

federal objective and 'conflicts' that make it 'impossible' for

private parties to comply with both state and federal law").  And

such federal-state conflict of duties is not the only ground on

which to conclude that there would be a frustration of

congressional intent.

FDA's regulation of prescription drugs is designed to ensure

each drug's optimal use through requiring scientifically

substantiated warnings.  Under-utilization of a drug based on

dissemination of scientifically unsubstantiated warnings, so as

to deprive patients of beneficial, possibly lifesaving treatment,

could well frustrate the purposes of federal regulation as much

as over-utilization resulting from a failure to disclose a drug's

scientifically demonstrable adverse effects.  Further, allowing

unsubstantiated warnings may also diminish the impact of valid

warnings by creating an unnecessary distraction and making even

23

valid warnings less credible.  See Lars Noah, Medicine's

Epistemology: Mapping The Haphazard Diffusion Of Knowledge In The

Biomedical Community, 44 Ariz. L. Rev. 373, 454-55 (2002); Thomas

Scarlett, The Relationship Among Adverse Drug Reaction Reporting,

Drug Labeling, Product Liability, and Federal Preemption, 46 Food

Drug. Cosm. L. J. 31, 36 (1991) ("overstated warnings could tip

judgment of the medical profession in an undesirable direction").

Here, contrary to the opinion of the district court (SER

1206-07), the concern with over-deterrence was of necessity a

factor in FDA's decision-making process.  The PDAC considered the

statement of the then Director of FDA's Division of

Neuropharacological Drug Products, Dr. Paul Leber (id. at 1207),

and the testimony of representatives of several mental health

groups that opposed warnings that would have suggested a causal

relation of SSRIs to suicide.[14]  In sum, it is inescapable that

any warning so dire as to suggest that there was a causal

relation between Zoloft and suicide would have chilled the drug's

otherwise beneficial use.

---

[14]  For example, the Executive Director of the National
Depressive and Manic-Depressive Association stated that a change
in labeling to suggest a causal relation between antidepressant
medications and suicide, "especially when there is no scientific
evidence to support such action, would generally harm the patient
community and make it more difficult to be treated with these
life-saving medicines."  SER 701-03.  See also SER 90-91, 47-53,
99-107.

24

**CONCLUSION**

For the foregoing reasons, the district court's Preemption

Order should be reversed.

<div style="margin-left: 45%">

Respectfully submitted,

ROBERT D. McCALLUM, JR.
<u>Assistant Attorney General</u>

DEBRA W. YANG
<u>United States Attorney</u>

</div>

OF COUNSEL:

DANIEL E. TROY
<u>Chief Counsel</u>
<u>Food and Drug Administration</u>

LYNN WHIPKEY MEHLER
<u>Associate Chief Counsel for Drugs</u>
<u>Food and Drug Administration</u>

HEIDI P. FORSTER
<u>Assistant Chief Counsel for Drugs</u>
<u>Food and Drug Administration</u>

<div style="margin-left: 45%">

DOUGLAS N. LETTER
(202) 514-3602
<u>Appellate Litigation Counsel</u>

ROBERT D. KAMENSHINE
(202) 514-2494
<u>Attorney, Appellate Staff</u>
<u>Civil Division, Room 9012</u>
<u>601 D Street, N.W.</u>
<u>Washington, D.C. 20530-0001</u>

</div>

SEPTEMBER 2002

<div style="text-align: center">25</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of September 2002, I filed the foregoing amicus brief for the United States with this Court by causing copies to be mailed, via Federal Express, and served the foregoing amicus brief for the United States upon counsel by causing copies to be mailed, via Federal Express, to:

    Pierce O'Donnell
    Ann Marie Mortimer
    Daniel C. Tepstein
    O'Donnell & Shaeffer LLP
    633 W. 5th Street, Suite 1700
    Los Angeles, California 90071
        (213)-532-2000

    Malcolm E. Wheeler
    Amy L. Padden
    Wheeler, Trigg & Kennedy
    1801 California Street, Suite 3600
    Denver, Colorado 80202
        (303)-292-2525

    George W. Murgatroyd III
    Karen A. Barth
    Jessica Dart
    Baum, Hedlund, Aristei, Guilford & Schiavo
    12100 Wilshire Boulevard, Suite 950
    Los Angeles, CA 90025
        (310)- 207-3233

_____
ROBERT D. KAMENSHINE
          Attorney

## CERTIFICATE OF COMPLIANCE

I hereby certify, as required by FRAP 32(a)(7)(C), that on the basis of a word count produced by computer, the foregoing brief contains 5,745 words.

ROBERT D. KAMENSHINE
Attorney